Fairmount Park Raceway, Inc., et al. [1] v. Commissioner. Fairmount Park Raceway, Inc. v. Commissioner
Docket Nos. 68442, 70279, 70280, 70318 - 70333, 70352 - 70354, 71924, 81571, 81713 - 81715, 81749 - 81751, 81762 - 81767, 81818, 81819, 82143, 82144, 82202 - 82204, 82481, 82482, 82506, 82517 - 82520, 82570, 82617, 82667, 82923, 85545, 88158.
United States Tax Court
T.C. Memo 1962-14; 1962 Tax Ct. Memo LEXIS 293; 21 T.C.M. (CCH) 52; T.C.M. (RIA) 62014; January 26, 1962
Sidney B. Gambill, Esq., Union Trust Bldg., Pittsburgh, Pa., and William W. Scott, Jr., Esq., for the petitioners. David L. Ketter, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: The Commissioner determined deficiencies in income and excess *294 profits taxes, additions to taxes and/or liabilities as transferees of assets of the corporate petitioner, Fairmount Park Raceway, Inc., as follows: Additions to Tax
1939 Code
1954 Code
Dkt.
Taxable
Transferee
Income
Sec. 294
Sec. 294
Sec. 294
No.
Year
Liability
Tax
(d)(1)(A)
(d)(1)(B)
(d)(2)
Sec. 6654
68442
4-30-54
$250,801.94
4-30-55
109,598.42
70279
4-30-53
$140,070.39
70280
4-30-53
142,520.01
70318
4-30-53
14,007.04
70319
4-30-53
21,010.57
70320
4-30-53
35,017.59
70321
4-30-53
28,014.08
70322
4-30-53
142,520.01
70323
4-30-53
15,088.15
70324
4-30-53
15,088.16
70325
4-30-53
142,520.00
70326
4-30-53
24,770.72
70327
4-30-53
15,088.16
70328
4-30-53
35,017.60
70329
4-30-53
35,017.59
70330
4-30-53
142,520.02
70331
4-30-53
30,176.32
70332
4-30-53
14,007.03
70333
4-30-53
142,520.02
70352
4-30-53
142,520.02
70353
4-30-53
14,007.03
70354
4-30-53
142,520.01
71924
1954
31,693.67
1955
20,728.14
81571
1954
2,629.46
1955
2,099.21
$ 33.03
81713
1954
477.81
$ 134.18
1955
388.74
81714
1954
477.81
140.56
$120.47
1955
385.42
3.66
81715
1953
339.51
210.47
1954
1,205.41
345.49
72.63
1955
989.94
81749
1954
851.64
205.50
1955
765.32
81750
1953
305.82
187.71
1954
1,041.39
244.74
156.85
1955
965.91
81751
1954
3,963.43
1955
2,955.91
81762
1954
1,183.19
1955
910.29
81763
1954
2,493.07
328.11
1955
1,476.37
81764
1954
2,754.16
1,869.83
612.86
1955
6,026.93
173.40
81765
1954
3,483.53
1,268.89
431.01
1955
2,686.73
23.49
81766
1955
2,361.44
98.41
81767
1954
5,079.31
81818
1955
502.23
81819
1954
657.25
175.31
123.81
82143
1956
1,424.75
1957
1,551.98
82144
1956
1,915.60
1957
1,740.01
82202
1956
745.26
1957
761.91
82203
1956
546.92
1957
541.17
82204
1956
345.92
1957
322.34
82481
1956
289.24
1957
320.45
82482
1954
2,126.37
1955
1,432.72
82506
1956
3,294.62
89.09
1957
2,706.89
60.69
82517
1954
34,628.86
1955
5,410.56
82518
1954
13,877.83
1955
12,539.73
82519
1956
730.41
1957
732.67
82520
1954
34,628.87
1955
5,410.56
82570
1954
1,332.48
1955
1,229.87
82617
1956
1,015.67
1957
945.68
82667
1956
3,705.35
1957
3,014.66
82923
1956
331.02
1957
332.02
85545
1954
8,395.04
1955
5,239.80
88158
1956
786.89
1957
1,024.86
1958
378.18
*295 By an amended answer filed at the trial the Commissioner would increase the deficiency for 1955 in Docket No. 71924, by $1,526.02. The questions remaining for decision are: Whether deductions for rental claimed by petitioner, Fairmount Park Raceway, Inc., in its returns filed for the fiscal years ended April 30, 1953, April 30, 1954, and April 30, 1955 are unreasonable and excessive in and by the amounts of $346,790.08, $412,359.50, and $221,343.12, respectively. Whether the amounts of excessive and unreasonable rentals, if any, received by individuals who were partners in Fairmount Park Association and who were also shareholders in Fairmount Park Raceway, Inc., constitute taxable ordinary income. Whether the transactions entered into in 1954 and 1957 between Fairmount Park Association, the partnership, and Fairmount Park Jockey Club, Inc., a corporation, with respect to a lease constituted installment sales or subleases. Whether the petitioners in Docket No. 81751 are entitled to any capital loss deductions in the year 1955 in excess of the amount of $1,000. Whether the individual petitioners in Docket Nos. 81571, 81714, 81764, 81765, 81766, and 82506 are liable for *296 additions to the tax under the provisions of section 6654 of the Internal Revenue Code of 1954. Whether the petitioner in Docket No. 81819 is liable for an addition to tax in the year 1954 under the provisions of section 294(d)(1)(A) of the Internal Revenue Code of 1939. Various concessions made by the Commissioner at the trial will be reflected in the Rule 50 computation. Findings of Fact The stipulated facts are hereby found. The petitioners appearing below filed their income tax returns for the years and with the district director of internal revenue for the district indicated: Petitioner
Year
Where Filed
Russell R. Casteel and
1954, 1955
Springfield, Ill.
Katherine Casteel
Richard E. King and June P.
1954, 1955
Columbus, Ohio
King
1956, 1957
Pittsburgh, Pa.
William C. O'Mara and Nora
1954, 1955, 1956, 1957
Pittsburgh, Pa.
S. O'Mara
Wayne W. McBeth and Lucille
1954, 1955, 1956, 1957
Pittsburgh, Pa.
P. McBeth
Charles K. Winsor and
1954, 1955, 1956, 1957
Pittsburgh, Pa.
Adaline P. Winsor
Roy F. O'Mara and Claire L.
1954, 1955, 1956, 1957
Pittsburgh, Pa.
O'Mara
John C. Moon and Marion A.
1954, 1955, 1956, 1957
Pittsburgh, Pa.
Moon
Edwin C. Moon and Martha H.
1954, 1955
Pittsburgh, Pa.
Moon
Sherry M. Young
1954, 1955
Pittsburgh, Pa.
Ludwig T. Petersen and Ruth
1954, 1955, 1956, 1957
Pittsburgh, Pa.
P. Petersen
M. H. Parish and Mae Parish
1954, 1955
Jacksonville, Fla.
1956, 1957
Pittsburgh, Pa.
Dan Parish and Gladys M.
1954, 1955, 1956, 1957
Pittsburgh, Pa.
Parish
Vera J. Newman
1955, 1956, 1957
Pittsburgh, Pa.
Roy S. Newman and Vera J.
1954
Pittsburgh, Pa.
Newman
William J. Parish, Jr., and
1955, 1956, 1957
Pittsburgh, Pa.
Nancy L. Parish
William J. Parish, Jr.
1954
Pittsburgh, Pa.
Edmund R. Casteel and Maud
1954, 1955
St. Louis, Mo.
L. Casteel
Virlee Stacy Trust, Melville
1954, 1955
Pittsburgh, Pa.
Bitner, Trustee
Ray C. Bennigsen and
1954, 1955
Chicago, Ill.
Veronica Bennigsen
Irene Stacy Trust, Melville
1954, 1955
Pittsburgh, Pa.
Bitner, Trustee
J. Clair Vance and Isabel M.
1954, 1955, 1956, 1957, 1958
Cleveland, Ohio.
Vance
Willibald Schaefer and
1954, 1955
St. Louis, Mo.
Cecile L. Schaefer
*297 The Fairmount Park Raceway, Inc., filed its returns with the district director of internal revenue at Springfield, Illinois. The Fairmount Park Association filed its appropriate partnership information returns for 1952 to 1956 with the district director of internal revenue at Springfield, Illinois, and for 1957 and 1958 with the district di-ector of internal revenue at 0pittsburgh, Pennsylvania. A group of ten individuals, composed of Dan Parish, Willibald Schaefer, Walter H. S. Wolfner, Edwin C. Moon, Walter H. S. Wolfner, Trustee, Ray C. Bennigsen, Russell R. Casteel, Michael H. Parish (also sometimes referred to as M. H. Parish), Festus Stacy, and A. B. Weingard, by an agreement dated July 9, 1947, formed a partnership to be known as Fairmount Park Association. The partners lived in various places in Missouri, Pennsylvania and Illinois. Their occupations varied from contractors to attorney and corporate official, and tallow, coffee and oil businesses. The partnership agreement provided, inter alia, as follows: WHEREAS, the undersigned as limited partners have executed a certain Lease Agreement with R. E. COSTELLO, Trustee, dated the 9th day of July, 1947; and, * * *298 *
WITNESSETH: * * *
1. Each of the undersigned have paid, as of this date, the sum of Six Thousand Seven Hundred Fifty Dollars ($6,750.00), to R. E. COSTELLO, Trustee, representing the total minimum rental for the year 1948, covering the premises set forth in the said Lease. 2. Each of the undersigned agrees to subscribe to the stock of a corporation to be organized under the laws of the State of Illinois, to be known as Fairmount Park Raceway, Inc., or other suitable corporate name, in the amount of Twenty-five Hundred Dollars ($2,500.00) each, such subscription to be paid in cash, on October 6, 1947, and each such subscriber to receive one-tenth (1/10) of the common capital stock of the said corporation to be issued pursuant to such subscription. Each of the undersigned partners agrees to pay into the partnership on October 6, 1947, the sum of Fifteen Thousand Seven Hundred Fifty and no/100 Dollars ($15,750.00) to be used by the partnership in improving the leasehold and for such other purposes as may be decided by the undersigned. On July 9, 1947, the same date as the partnership agreement, the partnership entered into a written lease agreement with R. E. Costello, *299 Trustee, representing persons who were strangers and not related to the partners, for leasing the 151-acre tract of land together with buildings known as Fairmount Park Racetrack located in Collinsville, Illinois. Costello would not lease the racetrack to a corporation. However, the ten individuals did not discuss whether a corporation could have obtained the lease by giving their personal individual guarantees. The lease of July 9, 1947 between the partners of Fairmount Park Association and Costello provided, inter alia, as follows: WITNESSETH, That the said party of the first part [Costello, Trustee] does hereby lease to the said parties of the second part [Wolfner, Stacy, Casteel, Wolfner, Trustee, Moon, Schaefer, Dan Parish, Dan Parish, Trustee, Weingard and Bennigsen] the following described property in the County of Madison and State of Illinois, to be used only as a race course for the racing of thoroughbred or harness horses, viz: The property located on the North side of U.S. Route No. 40 in Madison County, Illinois, and containing approximately One Hundred Fifty-one (151) acres and which is presently being used as a thoroughbred race course operated by the Fairmount *300 Park Jockey Club, Inc., together with all of the personal property belonging to the party of the first part which is now located at said race track and which is presently being used by the Fairmount Park Jockey Club, Inc., in the operation of its business. This lease is to cover the land and all buildings located on said land including the club house, grandstand, bleachers, secretary's office, feed barns, track kitchen, barns and any other buildings which are located on said property, * * * for the term of three years beginning on the 6th day of October, A.D. 1947, and ending on the 5th day of November, A.D. 1950, and the parties of the second part agree to pay as rent for said premises the sum of Two Hundred Two Thousand Five Hundred Dollars ($202,500.00), said payments to be made in the following manner: The sum of Sixty-seven Thousand Five Hundred Dollars ($67,500.00) to be paid upon the execution of this agreement; the sum of Thirty-three Thousand Seven Hundred Fifty Dollars ($33,750.00), to be paid on the 6th day of July, 1948, the sum of Thirty-three Thousand Seven Hundred Fifty Dollars ($33,750.00), to be paid on the 6th day of October, 1948; the sum of Thirty-three Thousand *301 Seven Hundred Fifty Dollars, to be paid on the 6th day of July, 1949, and the sum of Thirty-three Thousand Seven Hundred Fifty Dollars ($33,750.00) to be paid on the 6th day of October, 1949. And it is further understood and agreed that the parties of the second part will pay all taxes and carry Fire and Tornado insurance on said premises to the amount of not less than Two Hundred Eighty-five Thousand Seven Hundred Sixty Dollars ($285,760.00), during the term of this lease and deliver the policies of insurance to the party of the first part. And it is further understood and agreed between the parties that the rental hereinabove provided for is to be a minimum rental, and the parties of the second part will pay to the party of the first part one per cent (1%) of the total mutuel handle * of the meeting of the greatest mutuel handle, in lieu of rental, whether the operation be by them or their assigns, provided that the word "meeting" contemplates sixty (60) days of racing, whether consecutive or not; however, if the aggregate racing days shall be less than sixty (60) in any year that shall constitute a meeting as herein contemplated, if in the course of the operation of said rental *302 plant the said one per cent (1%) shall be greater at any meeting in any year than the sum of Sixty-seven Thousand Five Hundred Dollars ($67,500.00), said payments, if any, to be made each year. * The "total mutuel handle" means the gross amount wagered. The lease then provided for the right of renewing the lease for consecutive additional periods of three and four years on the same terms and an additional period of five years with the minimum rental increased to $75,000 per year, and a further additional period of five years with the minimum rental increased to $80,000 per year. It continued: And it is further understood and agreed that the parties of the second part shall have the right and option to remove any improvements which they might put on said property during the course of this lease, or any extension thereof, provided that by so doing they do not deface the property or render it unfit for the operation of a race track, and provided further that the right of removal herein provided for shall not be in effect if there is a default in the payment of any amounts due under the terms and conditions of this lease, or any renewal thereof. * * *
And it is further expressly *303 agreed between the parties that if default shall be made in the payment of the rent above reserved, or any part thereof, or in any of the covenants or agreements herein contained to be kept by the parties of the second part, their heirs, executors, administrators or assigns, it shall be lawful for the party of the first part, or his legal representatives, to re-enter into and upon said premises or any part thereof, either with or without process of law, and repossess the same and to distrain for any rent that may be due thereon, at the election of said party of the first part; and in order to enforce a demand and refusal or failure to pay at any time on the same day, or at any time on any subsequent day, shall be sufficient; and after such default shall be made, the parties of the second part and all persons in possession under them shall be deemed guilty of forcible detained of said premises under the statute. The lease also provided that the lessees were to pay all taxes and water assessments on the trade properties, to make any necessary repairs to keep the premises in a clean and healthy condition, and to turn back the properties in as good condition as when received. The racetrack *304 was situated directly across the river, via Veterans' Bridge, from St. Louis, Missouri, about fifteen minutes from the Statler Hotel. It was 31 years old and had been in operation since 1926. Its facilities included a one mile racing strip, a grandstand having a seating capacity of 3,900 and a total capacity of 22,000, a club house having a total capacity of 5,000, stalls for 1,100 horses and the usual backstretch facilities. In 1947 it was in a rather dilapidated condition. Pursuant to the terms of the July 9, 1947 partnership agreement, the ten partners caused Fairmount Park Raceway, Inc. (hereinafter sometimes referred to as the corporation) to be incorporated under the laws of Illinois on September 23, 1947, and, during all periods material hereto, its office and place of business was located at the track, Collinsville, Illinois. Each of the ten partners became an original shareholder of the corporation and owned 25 shares of its common capital stock having a par value of $100 per share and for which each of the shareholders paid into the corporation $100 per share. Because the laws of Illinois limited harness racing operations of any one entity to a particular number of *305 days, the ten individuals also formed a second corporation, Madison Raceway, Inc., shortly after the formation of the partnership in order to obtain a greater number of racing days by running two race meetings. In the fall of 1950, Madison Raceway, Inc., was dissolved because of the entry of Fairmount Park Raceway, Inc., into thoroughbred racing following the change in Illinois law in 1950 permitting night thoroughbred racing, and because a thoroughbred race meeting under Illinois law was limited to sixty days for any one enclosure or race course. The minutes of a meeting of the board of directors of the corporation held on December 21, 1947, at which all its directors (comprised of Parish, Schaefer, Wolfner, Stacy, Weingard, and Moon) were present, state: that it is understood that this Corporation is to function only as an agent for said partnership, both in handling the preparation of Fairmount Park for harness racing and the operation of racing meets under a lease from said partnership. In all cases this Corporation will serve only as the agent of the partnership, be supplied with operating and construction funds by the partnership, and will account to the partnership for *306 all actions taken and monies expended on its behalf. In addition the major decisions are not to be made by this Board of Directors, but are to be made by the Fairmount Park Association partnership, which will advise this Board on all questions of the expenditure of money and policy with respect to operating the racing meet. In December 1947, following the formation of the corporation, a letter was addressed to it by the ten individual partners containing the following: We, as members of the partnership which holds the lease on the Fairmount Park race track and who are leasing to you those premises for a spring harness race meet in 1948, enclose herewith $157,500.00 payable to your account. We hereby authorize you as our agent to make such capital improvements to said Fairmount Park race track as will place it in condition for night harness racing. Such capital improvements are to be made for our account and to be our property. You are to account to the undersigned for the cost of such expenditures. We appreciate that you will probably require funds in excess of your present capital for operation and maintenance expense in connection with the 1948 racing meet. You are authorized *307 to use any portion of the sum advanced herewith which remains after you have made the capital expenditures for our account, for the purpose of paying such expense. However, all expenditures made by you of that nature are to be for your account and funds so used are to be repaid by you to the undersigned, together with the unused balance of the $157,500.00 hereby advanced, on or before August 15, 1948, without interest. A lighting system for night racing was originally installed for the corporation's harness racing operation in 1948 at a cost of $142,290.66. During the year 1948, the partnership subleased the racetrack to the corporation under a written lease whereby the corporation was to pay rental to the partnership of "fifty (50%) per cent of any amounts which it has on hand after the payment of all bills and expenses incurred in the operation of said track." During the years 1949 and 1950, the partnership subleased the racetrack to the corporation under annual written leases whereby the corporation was to pay rental to the partnership of "seventy-five (75%) per cent of any amounts which it has on hand after the payment of all bills and expenses incurred in the operation *308 of said track." The necessary amount of capital to fund the pari-mutuel pool for the initial 1948 race meeting, approximately $200,000 was borrowed by the corporation from a bank, with the personal guarantees of the ten individuals who were partners and shareholders. The operations of the 1948 and 1949 racing seasons, which occurred during the corporation's fiscal years ended April 30, 1949 and April 30, 1950, respectively, consisted of running night harness races and resulted in net losses reported by that corporation on its tax returns filed for those fiscal years in the amounts of $10,257.63 and $31,857.43, respectively. After the law of Illinois was changed in 1950 to permit, for the first time, night thoroughbred racing, the corporation commenced a night thoroughbred racing operation for the 1950 racing season (the corporation's fiscal year ended April 30, 1951). The corporation, in its income tax return filed for its fiscal year ended April 30, 1951, reported net income in the amount of $76,438.32, which amount was after deduction of rental of 75 percent of net profits but before application of any net operating loss carryforward due to losses reported in the fiscal years *309 ended April 30, 1949 and April 30, 1950. At a meeting of the partnership held on September 16, 1950, the partners were advised that Weingard, Wolfner and Dyer (for whom Wolfner had signed the partnership agreement as trustee) had withdrawn from the partnership, had contributed their stock to the corporation, and wished to be relieved of all liability under the partnership agreement of July 9, 1947. Costello, who was present at the meeting, agreed to relieve those three from liability under the lease dated July 9, 1947. The withdrawal of these three partners was approved by the remaining partners. Immediately thereafter, the remaining partners and the shareholders of the corporation, each owning an equal one-seventh interest in each, were Dan Parish, Schaefer, Moon, Bennigsen, Casteel, Michael H. Parish and Stacy. Also at the September 16, 1950 meeting of the partnership, a lease agreement was entered into between the seven remaining partners and Costello under the date of November 3, 1950 for the period from November 6, 1950 to November 5, 1953, constituting the period covered by the first renewal option contained in the original lease of the racetrack. The lease agreement of *310 November 3, 1950 on the racetrack between the seven remaining partners and Costello provided substantially the same terms as the original lease including the rights to renew. Following a meeting of the partnership held on July 4, 1951, a lease covering the racetrack was executed between the partnership and the corporation on July 6, 1951 for the period from July 6, 1951 to November 15, 1951. That lease provided, inter alia, as follows: WHEREAS, the Party of the Second Part [the corporation] has been duly incorporated under and by virtue of the laws of the State of Illinois and under its charter has authority, To operate a raceway for the running of harness horse races; To operate a track, or course, for the purpose of running races involving thoroughbred horses; To operate a race track for the running of races under the supervision of the Illinois Racing Board; To operate a track for the purpose of running races for harness horses; To operate a race course for the purpose of running races under the supervision of the Illinois Harness Racing Board; To buy or lease property to be used in connection with the operation of said track; To operate concessions at which *311 food or drinks may be sold in connection with the operation of said race track; To conduct sporting events, exhibitions or amusements; and, WHEREAS, the Party of the Second Part is desirous of sub-leasing from the Parties of the First Part the real estate and personal property used in connection with the operation of the race course at Fairmount Park. NOW, THEREFORE, IT IS AGREED By and between the Parties to this agreement that the Parties of the First Part do hereby, by these presents, lease to the Party of the Second Part all of the real estate necessarily used in connection with the operation of the race track, or race course, at Fairmount Park, * * * said lease to extend for a period from the date hereof to the 15th day of November, 1951, with the privilege on the part of the Party of the Second Part to renew said lease for a comparable period each year thereafter during the life of a certain lease between the Parties of the First Part and R. E. COSTELLO, TRUSTEE, if it desires so to do, subject to it agreeing with the Parties of the First Part on any changes in the terms and conditions of said renewal period. And the Party of the Second Part, as a consideration for said *312 lease, agrees to pay to the Parties of the First Part the sum of One and no/100 ($1.00) Dollars, and agrees to pay all expenses incurred in connection with the management and operation of said race track, or race course, including all salaries, commissions, taxes, interests, repairs, improvements and betterments which might become necessary or convenient in order to operate said property. And the Party of the Second Part further agrees that if any races are conducted on said property, or if any money is derived from the operation of said property under this lease, that after the payment of all of the expenses necessarily incurred in the operation of said race meeting, or meetings, or any other operations that might be conducted by the Party of the Second Part, that it will, on or before thirty (30) days after any race meeting or venture conducted by it in each that it has a lease on said property, deliver to the Parties of the First Part 100% of the net profits, before taxes, of the current year's operation, said payment to be part of the consideration for this lease, or any renewal of the same. The corporation also agreed, inter alia, that it would comply with the terms of the *313 lease between the partnership and Costello covering the property in question; that the partnership would have the right to examine its books, and that it would avoid the imposition of mechanics' liens on the property. The corporation was given the right to use any improvements put on the property. The corporation, in its income tax return filed for its fiscal year ended April 30, 1952, reported no net taxable income or loss. On October 6, 1951, 1952, and 1953, leases covering the racetrack were executed between the partnership and the corporation for the period from October 6, 1951 to November 15, 1957. The provisions of these leases, except for the period thereof, were identical to those contained in the immediately preceding lease. At various partnership meetings held on February 1, 1951, February 14, 1952, and December 20, 1952, numerous assignments of portions of partnership interests were made to relatives of the partners, or to conclude fiduciary relationships. The partners amended the partnership agreement to admit the assignees into this partnership. The partners of Fairmount Park Association and their respective partnership interests remained the same during the calendar *314 years 1954 to 1958, inclusive, and the partners continued to share income and/or losses in those years in accordance with their respective fractional interests. At a partnership meeting held on September 11, 1953, at which Costello was also present, the form of lease agreement for the next four-year period, being the second renewal period contained in the original lease of July 9, 1947, was agreed upon. At this meeting, Costello was advised of the various transfers by some of the partners of their partnership interests, in whole or in part. Costello insisted that the lease for the second renewal period be signed only by the seven of the ten remaining original partners who were still liable and whose signatures were on the original lease, and in this connection refused to release Festus Stacy even though he was no longer a partner. Festus Stacy, who attended the meeting, agreed to sign the lease in order to satisfy Costello, and a lease agreement was so executed on September 11, 1953 for the period from November 6, 1953 to November 5, 1957. The lease of September 11, 1953 provided for a minimum rental for the four-year period of $270,000, payable $67,500 on the execution of the *315 lease and payments of a like amount on November 6, 1954, 1955, and 1956. The maximum rental for any year was three-fourths of one percent of the total mutuel handle (i.e., the total or gross amount wagered) for any racing meeting of 60 days or less, which was payable in lieu of the yearly minimum of $67,500. The lease of September 11, 1953 gave the lessees options to renew the lease for a period of five years beginning November 6, 1957, and ending November 5, 1962, under the same terms and conditions as the lease agreement of September 11, 1953, except that the minimum rental was $75,000 per year, and then to similarly renew for another five-year period ending November 5, 1967, except that the minimum rental was $80,000 per year. The leases of September 11, 1953, November 3, 1950, and July 9, 1947 contained substantially the following provisions: It is further understood and agreed that the Parties of the Second Part shall have the right and option to assign this lease to any person, firm, association or corporation, upon giving notice to the Party of the First Part and with the express understanding that said agreement of interest shall not release the Parties of the Second *316 Part from their liability under this lease, or any renewal of the same, it being understood that the liability of the Parties of the Second Part shall be several and not joint. An agreement was also made on September 11, 1953, between the partnership and the seven individuals who had just executed the second renewal lease agreement with Costello which, among themselves, obligated the actual partners under the lease and relieved the seven signatory parties from liability thereunder upon the assignment of all of their interest in the leasehold to the partnership. At all times subsequent to September 16, 1950 and during all periods material hereto, the stockholders of the corporation were Festus Stacy, Russell R. Casteel, Edwin C. Moon, Willibald Schaefer, Daniel C. Parish, Michael H. Parish and Ray Bennigsen, each of whom owned 25 shares of its common capital stock. Since that time, the corporation's paid-in capital has been the amount of $17,500. The corporation kept its books and filed its corporation income tax returns on the accrual method of accounting and on the basis of fiscal years ending April 30 of each year. There is set forth below, the net income or loss reported *317 by the corporation on its returns from the operation of the racetrack for each of its fiscal years ended April 30, 1948 to April 30, 1952, inclusive: Net Income
Fiscal Year Ended
or (Loss)
April 30, 1948
None
April 30, 1949
($10,257.63)
April 30, 1950
( 31,857.43)
April 30, 1951
76,438.32
April 30, 1952
None
The net income in the amount of $76,438.32 shown above for the fiscal year ended April 30, 1951, as previously stated, was after deduction of rental of 75 percent of net profits, but before application of any net operating loss carry-forward due to the losses reported in the fiscal years ended April 30, 1949 and April 30, 1950. The corporation's income tax returns filed for its fiscal years ended April 30, 1953, April 30, 1954, and April 30, 1955 reflected the following: Fiscal
Gross Receipts
Year
and Total
Total De-
Net In-
Ended
Income
ductions
come
4-30-53
$1,835,557.51
$1,835,557.51
None
4-30-54
2,066,518.84
2,066,518.84
None
4-30-55
1,823,571.85
1,823,571.85
None
Included as a part of the total deductions claimed by the corporation on its income tax returns as set forth above were the following *318 specific deductions: Fiscal Year
Salaries and
Ended
Wages
Rent
Purses
Totalizator
4-30-53
$242,308.31
$656,618.40
$629,172
$73,374.64
4-30-54
266,505.75
762,009.28
688,840
90,400.83
4-30-55
275,550.92
534,108.28
666,800
81,383.40
The partnership kept its books and filed its information tax returns on a calendar basis and on the cash receipts and disbursements method of accounting. The partnership, in its tax returns filed for the calendar years 1952, 1953, and 1954, claimed the following deductions: Deduction
1952
1953
1954
Salaries and wages
$ 31,345.08
$ 26,385.63
$ 40,285.06
Rent
67,500.00
68,500.00
49,786.94
Taxes
15,503.99
17,262.14
32,847.60
Losses (casualty)
12,527.48
589.71
Depreciation
47,610.78
16,543.44
99,484.51
Repairs
40,729.17
28,160.50
42,349.33
Other
24,044.34
26,744.57
16,939.21
Totals
$226,733.36
$196,123.76
$282,282.36
The amounts claimed as deductions on the partnership returns for the calendar years 1952, 1953, and 1954, except for depreciation and losses, were expended, but such amounts were expended by the corporation. The partnership did not maintain *319 any bank account. In determining the amounts of expenditures to be deducted by the corporation and by the partnership on their respective tax returns, an allocation of expenses was made between the two: the expenses incurred during the actual 60-day race meeting were attributed to the corporation and the remaining expenses, incurred while no race meeting was being conducted, were attributed to the partnership. The types and amounts of capital improvements to the racetrack properties and the years in which made are set forth below: 1948
1950
1951
Lighting Equipment
$142,290.66
Odds Board
12,496.66
$ 2,072.18
Furniture and Fixtures
7,082.68
$1,167.00
6,031.53
Track Equipment
9,445.27 *
5,185.00
5,705.84
Improvements and Alterations
69,803.08
Totals
$241,118.35
$6,352.00
$13,809.55
1952
1953
1954
Lighting Equipment
Odds Board
Furniture and Fixtures
$ 3,166.59
$ 3,648.63
$ 2,862.11
Track Equipment
12,381.54
8,099.00
3,798.14
Improvements and Alterations
40,871.39
23,290.65
73,149.95
Totals
$56,419.52
$35,038.28
$79,810.20
*320 There has been allowed for depreciation on the capital improvements made by the partnership to the racetrack properties the following amounts for the following periods: Calendar Year
1948 to 1951, inclusive
$208,701.69
1952
47,610.78
1953
16,500.34
1954
37,088.62
Total
$309,901.43
Applications for race meetings were filed with the Illinois Racing Commission by the corporation in its own name, and such applications were signed by the president and secretary of the corporation. Included as a part of each application was a list of the names and addresses of all shareholders, together with their businesses. Furnished to the Illinois Racing Commission along with each application was a financial statement of the corporation. The corporation, while maintaining its books and filing its corporation income tax returns on a fiscal year basis ended April 30, concluded its racing business by the end of the preceding calendar year and paid its profits for that year to the partnership before the end of such calendar year. Consequently, the corporation's fiscal years ended April 30, 1953, April 30, 1954, and April 30, 1955, in effect coincide with the partnership's *321 calendar years 1952, 1953, and 1954, respectively. Each of the thoroughbred racing operations conducted by the corporation during the years 1950 to 1954, inclusive (corporation's fiscal years ended April 30, 1951 to April 30, 1955, inclusive), comprised 60 days of racing and consisted of two 30-day race meetings - an early 30-day meeting usually held in May and June and a later 30-day meeting usually held in September and October. During the racing seasons in the years 1952, 1953, and 1954 (the corporation's fiscal years ended April 30, 1953, April 30, 1954, and April 30, 1955, respectively), the total "track take" was 15 percent of the mutuel handle, the share of the State of Illinois being 6 percent, and the corporation retaining 9 percent. In addition, the State of Illinois and the corporation each received one-half of the breakage to the nearest dime, which means that for each dollar bet, any winning ticket received its share of the pool only in multiples of ten cents and that any odd cents over the particular multiple of ten was shared by the State and the corporation. Expenses of the racing operation, including purses, were paid by the corporation out of such racing receipts. *322 The total pari-mutuel handle of the corporation from the operation of the racetrack, i.e., the gross amount wagered at the track in each of its fiscal years ended April 30, 1953, April 30, 1954, and April 30, 1955, amounted to $15,491,416, $17,482,489 and $15,638,238, respectively. In 1955 Illinois increased the percentage going to the track from 9 percent to 11 percent on any day in which the mutuel handle was $300,000 or less. The partnership reported in its information returns the following amounts as rents received from the corporation during the calendar years 1952, 1953, and 1954: Calendar
Year
Amount
1952
$656,618.40
1953
762,009.28
1954
534,108.28 These identical amounts were deducted as rentals by the corporation on its appropriate income tax returns. The partnership paid to Costello as lessor under the leases dated November 3, 1950 and September 11, 1953, the following amounts of rental for the racetrack in each of the calendar years 1952, 1953, and 1954: Calendar
Year
Amount
1952
$67,500
1953
67,500
1954
49,786
The partnership also paid as rental in the calendar year 1953 the amount of $1,000 for another parcel of *323 real estate to increase the parking space at the racetrack. In the calendar year 1954, the difference between the amount paid as rental to Costello and the minimum amount of rental and/or maximum rental based upon percentage of mutuel handle as called for in the lease dated September 11, 1953 was never paid. The reasonable rental value for the racetrack leased by the corporation from the partnership in the former's fiscal years ended April 30, 1953, April 30, 1954, and April 30, 1955 are the amounts of $309,828.32, $349,649.78, and $312,765.16, respectively. The amounts of deductions claimed for rental by the corporation in its income tax returns filed for its fiscal years ended April 30, 1953, April 30, 1954, and April 30, 1955 in excess of the above amounts are not rent in the amounts of $346,790.08, $412,359.50, and $221,343.12, respectively. At the end of a racing meet and at the "wind-up" of the racing season, the corporation paid over its entire net income, before taxes, to the partnership and had only about $17,500 left. The corporation's financial position at the end of each of its fiscal years ended April 30, 1953, April 30, 1954, and April 30, 1955, as shown by its *324 balance sheets for those years, was as follows: Fiscal Year Ended
April 30, 1953
April 30, 1954
April 30, 1955
ASSETS
Cash
$27,783.69
$26,493.49
$ 1,024.29
Notes and accounts receivable
14,278.92
25,097.50
17,147.39
Other assets
26,684.31
42,836.24
547.20
Total Assets
$68,746.74
$94,427.23
$18,718.88
LIABILITIES
Accounts payable
$ 468.24
$ 1,571.49
Accrued expenses
51,300.11
$ 2,448.84
Accrued liabilities
75,000.00
Capital stock (common)
17,500.00
17,500.00
17,500.00
Earned surplus and undivided
(521.61)
(521.61)
(352.61)
profits
Total Liabilities
$68,746.74
$94,427.23
$18,718.88
A schedule in the stipulation of facts reflects the actual amounts received from the corporation by the individuals named in each of the calendar years 1952, 1953, and 1954 out of the total amounts determined by the Commissioner in each year to constitute excessive rental. The corporation was completely liquidated and dissolved as of May 23, 1955. Upon the liquidation, each shareholder received the sum of $2,449.63 for his 25 shares of stock of the corporation. On September 17, 1954, the corporation entered into an agreement, *325 designated "Cancellation and Assignment of Certain Leases and Agreements", with Fairmount Park Jockey Club, Inc., an Illinois corporation, which agreement provided, in part, as follows: AND NOW, this 17th day of September 1954, the undersigned, for value received, hereby: 1. Agrees that a lease made the 6th day of October, 1953, by and between Daniel C. Parish, William C. O'Mara, Claire Parish O'Mara, Adaline Parish Winsor, Lucille Parish McBeth, William J. Parish, Jr., Willibald Schaefer, Willibald Schaefer, Trustee, Edwin C. Moon, John C. Moon, Isabel M. Vance, Sherry M. Young, Michael H. Parish, June V. King, Ruth V. Peterson, Vera J. Newman, Russell R. Casteel, E. R. Casteel, Maude L. Casteel, Melville Bitner, Trustee, and Ray C. Bennigsen AND Fairmount Park Raceway, Inc., authorizing it to operate a race meet for the years 1954, 1955, 1956 and 1957 be cancelled and declared null and void for the expiration of its term. 2. Assigns to the Fairmount Park Jockey Club, Inc., all its right, title and interest in and to: A. An agreement dated the 8th day of September 1953 with the Berlo Vending Company, 333 South Broad Street, Philadelphia, Pennsylvania, for the operation of *326 the concessions at the track for the period of approximately four (4) years beginning on the 15th day of December, 1953 and ending on the 1st day of November, 1957. B. An agreement dated the 17th day of November, 1947 with the Illinois Power Company, for the supplying of electric energy. C. Agreements dated the 1st day of September, 1952 with the American Totalizator Company, Inc., for the furnishing of totalizator service. Also on September 17, 1954, the individual partners as "owners and lessees" of the Fairmount Park lease, as parties of the first part, entered into an agreement, designated "Assignment", with Fairmount Park Jockey Club, Inc., as party of the second part, which agreement provided, in part, as follows: WHEREFORE, FOR VALUE RECEIVED: 1. We, the undersigned, Parties of the First Part, hereby transfer, assign and set over unto the Party of the Second Part, all our right, title and interest in and to the lease above mentioned, subject to and in accordance with the provisions of an agreement made this date and made a part hereof by and between the Party of the Second Part, and we, the undersigned. 2. We, the undersigned, Parties of the First Part, hereby agree *327 that an agreement made the 6th day of October, 1953 by and between ourselves with Fairmount Park Raceway, Inc., authorizing it to operate a race meet for the years 1954, 1955, 1956 and 1957 be cancelled and declared null and void for the expiration of its term. 3. The Party of the Second Part hereby accepts said assignment and assumes all the rights and liabilities under the terms and conditions of said lease and agreement herein referred to and relieves the Parties of the First Part of all liability under said lease dated September 11, 1953. On the same date, September 17, 1954, the partnership, as "Sellers" also entered into an agreement with Fairmount Park Jockey Club, Inc., as "Buyer," which provided, in part, as follows: WHEREAS, Sellers are the owners of the leasehold estate created by that certain lease called an "Indenture", dated September 11, 1953, between R. E. Costello, Trustee, as party of the first part, and Festus Stacy, Russell R. Casteel, Edwin C. Moon, Willibald Schaefer, Daniel C. Parish, Michael H. Parish, and Ray C. Bennigsen, as parties of the second part, and Sellers are also the owners of all other rights and interests of the lessees under said lease, *328 and a true copy of said lease is attached hereto; and WHEREAS, by said lease of September 11, 1953, said R. E. Costello, Trustee, leased to the parties of the second part named in said lease and hereinabove mentioned, for a term of four (4) years, beginning November 6, 1953, and ending November 5, 1957, certain real estate located on the north side of U.S. Route 40 in Madison County, Illinois, containing approximately 151 acres, [being the raceway properties] * * * WHEREAS, Sellers have heretofore caused a corporation by the name of Fairmount Park Raceway, Inc., to be organized under the laws of Illinois, and by an agreement dated October 6, 1953, have subleased to said corporation said race track property, and Sellers, or said corporation, have for some years used and operated all of the property covered by said lease of September 11, 1953, and other property located on the leased real estate as a race track or race course, and Sellers and said corporation have lately canceled and surrendered said sublease of October 6, 1953, so that said lease of September 11, 1953, and all of said property now belong absolutely to Sellers, and Sellers have agreed to sell said lease (subject *329 to the reservations hereinafter mentioned in article II hereof) and all other property used in or about the operation of such race track, either by Sellers or by their said corporation, to Buyer, for the consideration and upon the terms and conditions hereinafter set forth, and Buyer has agreed to purchase said properties for such consideration and upon such terms and conditions: NOW, THEREFORE, THIS AGREEMENT WITNESSETH that, in considertion of the premises and of the payments made and to be made by Buyer to Sellers, as hereinafter provided, and of the mutual covenants and agreements hereinafter set forth, Sellers do hereby sell, assign, and transfer unto Buyer said lease of September 11, 1953, and the leasehold estate thereby created and all other rights and interests of the lessees therein whatsoever (subject to the reservations hereinafter set forth in article II hereof), and also all other [raceway property] * * * and Buyer hereby purchases said leasehold estate and all rights and interests of the lessees under said lease of September 11, 1953, and all other property as aforesaid from Sellers for the considerations and upon the covenants and agreements, terms and conditions *330 hereinafter set forth, that is to say: I. Buyer covenants and agrees to pay to Sellers, and Sellers agree to accept from Buyer, as full consideration for the leasehold estate and all other rights and interests of the lessees under said lease of September 11, 1953, One Million Thirty-Five Thousand Dollars ($1,035,000.00), and for all such other property Eighty-five Thousand Dollars ($85,000.00), making a total consideration paid and to be paid by Buyer to Sellers of One Million One Hundred Twenty Thousand Dollars ($1,120,000.00), of which total consideration Buyer has this day paid to Sellers the sum of Three Hundred Thirty Thousand Dollars ($330,000.00) in cash, receipt of which is hereby acknowledged, and Buyer convenants and agrees to pay the remainder of such consideration as follows: Ninety Thousand Dollars ($90,000.00) on or before January 15, 1955; Two Hundred Thirty-three Thousand One Hundred Dollars ($233,100.00) on or before November 1, 1955; Two Hundred Thirty-three Thousand One Hundred Dollars ($233,100.00) on or before November 1, 1956; Two Hundred Thirty-three Thousand Eight Hundred Dollars ($233,800.00) on or before November 1, 1957. Said deferred payment of Ninety *331 Thousand Dollars ($90,000.00) shall not bear interest prior to its due date, but the remaining deferred payments shall bear interest from November 1, 1954, at the rate of four (4) percentum per annum, payable annually. Said deferred payment of Ninety Thousand Dollars ($90,000.00) shall be evidenced only by this present agreement, but the three remaining deferred payments shall be evidenced by three non-negotiable promissory notes of Buyer, payable to Sellers, and such notes have this day been made and executed and delivered to Ray C. Bennigsen, who has been and is hereby designated by Sellers for the purpose of holding such notes, subject to the terms of this agreement. Buyer hereby agrees, within a reasonable time hereafter, to cause to be printed its senior debentures or notes, payable to bearer, and in such denominations as may be requested by said Ray C. Bennigsen (but none shall be for less than $100.00) for convenient distribution among Sellers in accordance with their respective interests in such deferred purchase money, and to execute and deliver the same to said Ray C. Bennigsen for proper distribution among Sellers. Buyer shall have no responsibility with respect to such *332 distribution. Such senior debentures or notes shall have attached thereto interest coupons, which may be detached, and such interest coupons shall be paid by Buyer to the lawful holder or holders thereof regardless of whether or not Buyer shall anticipate the payment of such deferred purchase money. Such senior debentures or notes shall be in such form, not inconsistent herewith, as may be agreed upon by said Ray C. Bennigsen, acting for Sellers, and Buyer. They shall be subject to the terms of this agreement and therefore non-negotiable. Upon the issuance of such senior debentures or notes, the three non-negotiable promissory notes first hereinabove mentioned evidencing such deferred purchase money shall be canceled and surrendered to Buyer. The three temporary notes first above mentioned, as well as the senior debentures or notes which are to be substituted therefor as aforesaid, shall be payable at the First National Bank of St. Louis, Missouri. II. By said lease of September 11, 1953, the lessor therein granted to the lessees therein and their assigns the right and option to renew the lease for an additional term of five (5) years, upon certain terms and conditions therein set *333 forth, and, if such option should be exercised, the lessor in said lease granted to the lessees in said lease and their assigns the further right and option of renewing the lease for a second additional term of five (5) years, all of which will more fully appear from said lease, copy of which is attached hereto as aforesaid. The parties hereto fully understand that Sellers, by this present agreement, have hereby sold and assigned to Buyer only the remainder of the original four (4) year term of said lease, and not the right to exercise said options, or either of them, such right being expressly hereby reserved by Sellers. Sellers, however, do hereby grant to Buyer the exclusive right and option to purchase from Sellers all of the remaining interests in said lease which are reserved by Sellers in this article II. Buyer shall have the right to exercise this option at any time prior to one hundred (100) days before the end of the original term of said lease by giving written notice thereof to said Ray C. Bennigsen, 601 Spruce Street, Winnetka, Illinois, as representative of all of Sellers. If, however, at the time Buyer may wish to exercise the option hereby granted to it said Ray C. *334 Bennigsen shall not be living, such written notice may be given either to said Russell R. Casteel or said Edwin C. Moon. If the option hereby granted Buyer shall be exercised as aforesaid, it shall pay to Sellers therefor the sum of Six Hundred Thousand Dollars ($600,000.00) in cash or in two (2) installments of Three Hundred Thousand Dollars ($300,000.00) each, the first installment being due November 1, 1958, and the second installment being due November 1, 1959. Sellers further agree, however, that at Buyer's option, Buyer shall have five (5) years in which to pay such purchase money, but in this event the amount thereof shall be increased to Seven Hundred Thousand Dollars ($700,000.00), and said sum shall be payable to Sellers in five (5) equal annual installments of One Hundred Forty Thousand Dollars ($140,000.00) each, the first of such installments being due November 1, 1958, and a like installment being due on the first day of November in each of the four succeeding years. If said option shall be exercised as herein provided, and unless the payment therefor be made in cash, all deferred purchase money shall bear interest at the rate of four (4) percentum per annum from November 1, 1957, and *335 shall be evidenced by the non-negotiable promissory notes of Buyer, payable at the First National Bank of St. Louis, Missouri. Buyer shall have the right to anticipate the payment of any or all of such deferred purchase money. III. Sellers hereby further grant to Buyer the right to purchase said lease of September 11, 1953, and the leasehold estate thereby created and all other rights and interests of the lessees therein whatsoever, including the right and option to renew the lease for two additional terms of five (5) years each, and also all other property of every kind and character whatsoever now located on said leased real estate, and also all other property of Sellers and of said Fairmount Park Raceway, Inc., which has been used in or about the operation of said race track, whether such property is now located on said leased real estate or not, for the sum of One Million Four Hundred Seventy Thousand Dollars ($1,470,000.00), payable on or before December 31, 1955. In the event this option shall be exercised, Buyer shall be credited with the cash payment of $330,000.00 this day made by it to Sellers, as hereinabove mentioned in article I hereof, and also any and all other payments *336 of deferred purchase money made by it to Sellers prior to the exercise of such option, and all notes evidencing deferred purchase money shall be canceled and surrendered to Buyer, and Sellers shall forthwith execute and deliver to Buyer a supplement to this present agreement transferring and assigning to Buyer the interests in the lease of September 11, 1953, and the leasehold estate thereby created which are presently reserved to Sellers in article II of this agreement. Notwithstanding the foregoing provisions of this article III, Buyer shall have no right to exercise the option granted to it by this article unless it shall procure and deliver to Sellers at the time of the exercise of such option a formal release executed by the lessor of said lease of September 11, 1953, releasing Sellers from all obligations as lessees with respect to the said lease. IV. Buyer covenants and agrees to pay the rental due and payable on November 6, 1954, as provided in said lease of September 11, 1953, and to pay when due all other rental thereafter due as provided in said lease and keep and perform all other covenants and agreements to be kept or performed by the lessees therein during the remainder *337 of the original term of said lease, and of any extension thereof if either of the options hereinabove granted to Buyer in articles II and III hereof shall be exercised, and Buyer shall indemnify and save harmless the lessors from any and all loss or damage by reason of its failure to pay such rental and keep and perform such covenants. If Buyer shall fail to pay such rental or fail to keep and perform such covenants and agreements as hereinabove provided, or shall make default in the payment of any one or more of the installments of deferred purchase money, as provided in article I hereof, or as provided in article II hereof if the option granted Buyer in article II shall be exercised, and if any such default shall continue for a period of sixty (60) days or more, Sellers may, after giving Buyer at least thirty (30) days written notice of their intention so to do, cancel this agreement and retake all of the properties and rights and interests covered by this agreement. To secure the payment of the deferred purchase money, as provided for in this agreement, and the payment by Buyer of the rental, and the keeping and performance by Buyer of the other covenants and agreements to be kept *338 or performed by the lessees in said lease of September 11, 1953, to the extent the same are assumed by Buyer as aforesaid, Sellers hereby reserve a vendor's lien upon all of the property and interests which are sold, assigned, or transferred by this present agreement. V. Sellers covenant and agree that they will keep and maintain the race track properties in good repair and condition at their own expense until January 1, 1955; provided, however, that in the event any of such properties, except the barns specifically mentioned in article VI hereof, shall be damaged or destroyed by fire or other casualty at any time prior to January 1, 1955, the liability of Sellers shall be limited to, and discharged by, the insurance required to be kept and maintained by Sellers under the provisions of article VI hereof. Sellers further covenant and agree that they will pay all utilities, the wages of a night watchman, the salary of the track superintendent, and all other expenses in connection with said properties until said date. Sellers further covenant and agree that they will pay all taxes levied upon said properties for the year 1954 and prior years. Buyer covenants and agrees at its expense *339 to keep and maintain said properties in good repair and condition and pay all taxes assessed thereon after January 1, 1955, during the remainder of the original term of said lease, and, if either of the options provided for in articles II and III hereof shall be exercised, during any extension of the term of said lease. VI. Sellers covenant and agree that they have procured, and now have in force, insurance insuring the grandstand, the bleachers, club house, and all other improvements on the leased premises against loss or damage by tornado and fire, with extended coverage, in at least the amount of Nine Hundred Fifty-Seven Thousand Dollars ($957,000.00), and that they will keep such insurance in full force and effect at their own expense until January 1, 1955. Buyer covenants and agrees that it will keep such insurance in at least said sum in full force and effect at its expense from January 1, 1955, until the end of the original term of said lease of September 11, 1953, and, if either of the options hereinabove mentioned in articles II and III hereof shall be exercised, then during any extension of the original term of said lease. In the event the improvements on the leased land *340 shall be damaged or destroyed by fire or other casualty covered by the aforesaid insurance, all proceeds from such insurance shall be used solely and without delay for the repair and rebuilding of the improvements so damaged or destroyed. To that end the parties hereto agree that all of such insurance policies shall be made payable to R. E. Costello, Trustee, and to Buyer, as their interests may appear, and said Trustee and Buyer shall hold such proceeds and use and apply the same solely for the purpose of repairing or rebuilding the improvements damaged or destroyed as aforesaid, and such repairing or rebuilding shall be done under the supervision and direction of Buyer. All such insurance policies shall be deposited with Buyer and held by it pursuant to the terms of this agreement. Two of the barns, containing an aggregate of ninety-eight (98) stalls, which were located on the real estate comprising the race track property, have recently been destroyed by fire. Sellers covenant and agree that they will forthwith, at their own expense, replace such barns with barns suitable for use by Buyer in operating a race track and containing at least as many stalls as the barns which were *341 destroyed. * * *
IX. It is the intention of the parties hereto that if Buyer shall keep and perform the covenants and agreements to be kept and performed by it as set forth in this agreement, Buyer shall have and enjoy a complete racing meeting in each of the years comprising the remainder of the original term of the lease of September 11, 1953. Therefore, in the event Buyer shall be prevented from conducting a complete racing meeting at the race track properties during any one or more years comprising the remainder of the original term of said lease because of a war or war emergency which occurs through the action of the Government of the United States or any lawful governmental authority of the United States or because of the action of any local or state government or agency thereof declaring pari-mutuel betting illegal, there shall be a just and proportionate rebatement or abatement in the purchase price paid or to be paid under the provisions of article I hereof. X. In the event Buyer shall exercise the option granted to it in article II hereof, and if any of Sellers shall desire to be indemnified or released from all his obligations as a lessee with respect to said lease *342 of September 11, 1953, such Seller shall give written notice to Buyer requesting such indemnification or release, and Buyer shall obtain a satisfactory indemnity bond or a release from the lessor of said lease. If such bond or such release is obtained by Buyer and delivered to such Seller, such Seller shall, in consideration thereof, waive and relinquish in writing his proportionate part of the purchase money to be paid by Buyer to Sellers under the provisions of article II. The transaction as finally consummated between the partnership and Fairmount Park Jockey Club, Inc., under the September 17, 1954 agreement did not include the exercise by Fairmount Park Jockey Club, Inc., at that time of either of the options granted to it in Articles II and III of the agreement. At the time the "Agreement" and the "Assignment" both dated September 17, 1954, were executed, the 1954 racing season had been concluded by the corporation and there remained, under the lease dated September 11, 1953 between Costello and the seven individuals who signed it, only three racing years, i.e., 1955, 1956, and 1957. Ray C. Bennigsen, holding a one-seventh interest in both the partnership and the corporation, *343 also owned a ten percent interest in the corporation, Fairmount Park Jockey Club, Inc. The books and records of the partnership during the calendar years 1952 to 1958, inclusive, were under the care of an accountant with forty years' experience who was made aware of, and was acquainted with, the transaction in 1954 between the partnership and Fairmount Park Jockey Club, Inc. The partnership returns in the calendar years 1954 to 1958, inclusive, were signed by a partner and stated that the partnership was engaged in the "rental" business. In 1957, Fairmount Park Jockey Club, Inc., exercised its option under Article II of the "Agreement" of September 17, 1954. Also in 1957, the option to renew the lease of September 11, 1953 between Costello and the seven individuals who signed it for the first five-year period was exercised. On September 19, 1957, the individual partners entered into an agreement, designated "Assignment", with Fairmount Park Jockey Club, Inc. which agreement provided, in part, as follows: WHEREAS, by assignments made the 17th day of September, 1954, hereinafter such assignments collectively being called the Assignment, the Assignors assigned to the Assignee, *344 all right, title and interest of the Assignors in and to that certain lease dated September 11, 1953 executed by and between R. E. Costello, Trustee, and Daniel C. Parish, Willibald Schaefer, Ray C. Bennigsen, Michael H. Parish, Russell R. Casteel, Edwin C. Moon and Festus Stacy for use as a race course the property known as Fairmount Park containing approximately one hundred fifty-one (151) acres located on the north side of U.S. Route 40, including the club house, grandstand, secretary's office, jockey's quarters, feed barns, track kitchens, barns, and all other buildings with the exception of a sales pavilion the property of H. E. Eddy, and WHEREAS, the Assignment provided it was subject to and in accordance with the provisions of an agreement made September 17, 1954 by and between Daniel C. Parish, et al. and Assignee, hereinafter called the Agreement, and WHEREAS, the Assignee has now exercised the options to it granted in the Agreement and has now complied with all of the provisions thereof, and WHEREAS, the Assignee has delivered to Ray C. Bennigsen, as agent of the Assignors, $700,000 principal amount of its 4% Senior Debentures, dated September 10, 1957, payable $140,000 *345 annually at the First National Bank of Chicago, Chicago, Illinois. NOW, THEREFORE, in consideration of the premises it is agreed: 1. Each of the undersigned Assignors for himself, his heirs, personal representatives, successors, assigns and (except as to Festus Stacy who is not a partner therein) for Fairmount Park Association, a partnership, hereby: (a) Acknowledges receipt of his proportionate share of said Senior Debentures; (b) Transfers, assigns and sets over unto the Assignee, its successors and assigns all his right, title and interest in and to the above-mentioned lease dated September 11, 1953; (c) Appoints the Assignee, its successors and assigns his irrevocable attorney, with power of substitution, to exercise the right and option of renewing said lease dated September 11, 1953 for an additional period of five (5) years after the 5th day of November, 1962; (d) Warrants that he has not granted or transferred any interest in the leasehold created by the said lease dated September 11, 1953 to any person other than one named in the first paragraph of this instrument. 2. The Assignee hereby accepts said Assignment and assumes all the rights and liabilities under *346 the terms and conditions of said lease and the Agreement herein referred and relieves the Assignors of all liability under said lease dated September 11, 1953. In furtherance of the transaction made on September 19, 1957, Fairmount Park Jockey Club, Inc., issued $700,000 worth of its debentures to the partners. During the calendar years 1954 to 1957, inclusive, the partnership received from Fairmount Park Jockey Club, Inc., under the document designated "Agreement" dated September 17, 1954, the amounts of $330,000, $323,100, $233,100, and $233,800, respectively, and during the calendar year 1958, the partnership received from Fairmount Park Jockey Club, Inc., under the document designated "Assignment" dated September 10, 1957 (and pursuant to the option contained in Article II of the agreement designated "Agreement" dated September 17, 1954) the amount of $140,000. The partners, for each of the calendar years 1954 to 1958, inclusive, reported the amounts received by or credited to them from the net proceeds of the amounts set forth above as long-term capital gain. Opinion Amount of Deductions for Rent The petitioner-corporation paid and deducted sublease rental payments *347 to a partnership comprised only of the corporation's stockholders, and, except in one instance, their close kin. The amounts claimed as deductions for rent, the amounts disallowed, and allowed by the Commissioner in the taxable years indicated are as follows: Fiscal Year Ended April 30,
1953
1954
1955
Amounts Claimed
$656,618.40
$762,009.28
$534,108.28
Amounts Disallowed
346,790.08
412,359.50
221,343.12
Amounts Allowed
309,828.32
349,649.78
312,765.16
The parties are content to have the issue decided within the framework of what constitutes a "reasonable" rental. Although provisions of the Internal Revenue Codes relating to the deduction of rentals do not use the characterization of "reasonable" in circumstances such as we have here, the issue may be postured in the same arm's length test as used to ascertain "reasonableness". Jos. N. Neel Co., 22 T.C. 1083, 1090. The petitioners urge that the rent provided by the sublease was reasonable because the partnership had the basic lease on the racetrack facilities and was subject to its obligations; that the partnership made capital improvements on the properties of $432,547.87; *348 that they furnished all of the financial backing for the corporation and the "know how" to operate and maintain the track except during the 60-day period of active racing; and that the corporation was the partnership's agent. They also urge that, on the other hand, the corporation had a capital of only $17,500; and that it fulfilled a function during the operation of the racing program but was idle many months of each year. The petitioners also would use as an indication of what a reasonable rental would be, the Commissioner's argument under a different issue, that a transaction entered into in 1954 with relation to the property was a sublease which at that time had three years to run. The price for the three years, $1,035,000, according to the petitioners, thus established a rental of approximately $345,000 per year. The Commissioner's position is that the corporation is a separate tax entity that was created for the particular purpose of operating the track during the racing periods; that in order to do this it entered into the leases with the partnership whereby it obtained the use of the properties and agreed to pay the rent for them; that petitioners' contention that rent payments *349 of the entire net profits of the corporation before taxes is reasonable cannot be accepted because such provisions are unusual and scrutiny is required due to the close relationship between the corporate stockholders and the partnership. We believe that the rental provided in the sublease agreement will not stand the scrutiny necessary in such circumstances, particularly in the light of somewhat similar arm's length transactions. In making the determination of the deficiency for the taxable year ended April 30, 1953, the Commissioner indicated that the amount of rent allowed was computed on a basis of 2 percent of the mutuel handle, which is the gross amount wagered at the track. The Commissioner relies upon the testimony of his valuation expert who had made a study of lease arrangements of pari-mutuel race tracks in the United States to establish the going rates of rental based upon percentages of the pari-mutuel handle and of net profits. His testimony was that rentals of pari-mutuel race tracks are generally based upon (1) a percentage of mutuel handle, (2) a percentage of net profits, (3) or a flat dollar amount; that in the case of a rental based upon a percentage of mutuel *350 handle where the lessee bears all the expenses of both the active and inactive periods of the track, a reasonable rental would be from one-half to three-fourths of one percent of the mutuel handle; that in the case of a rental based on a percentage of mutuel handle where the lessor bears only the expenses pertinent to the race meeting with the lessee bearing the expenses of the inactive period, reasonable rental was 1 1/2 percent to 2 percent of the mutuel handle; that in cases where the rental is based upon a percentage of net profits, the lessee usually bearing no more than the direct cost of the race meeting or sometimes less, the reasonable rental is from 30 to 50 percent of net profits; that in such instances when the lessor bears a part of the direct cost of the race meeting, 50 percent of the net profits is a reasonable rental or where the situation is otherwise, 30 to 40 percent of the net profits is a reasonable rental; that in the case of a rental based upon a flat dollar figure, the reasonable rental when converted into the percentage of the mutuel handle will approximate 1 1/2 to 2 percent of the mutuel handle. The Commissioner has used the pari-mutuel handle most generous *351 in amount in determining the present deficiencies. The rental allowed by the Commissioner is also in excess of 40 percent of net profits of the lessee, which percentage was shown by the expert to have been used in situations where, as here, the lessor did not bear a part of the direct costs of the race meeting. The Commissioner argues that under the lease the partnership had with Costello it paid rental for 1952, 1953, and 1954 in the amounts of $67,500, $67,500, and $49,786. Under the terms of the lease for 1954 it was obligated to pay $117,287, being the rental computed on the basis of the rate of the mutuel handle. It, however, paid the lessor the sum above mentioned. Compared to this, the Commissioner notes the corporation deducted as "reasonable" rental the amounts of $656,618.40, $762,009.28, and $534,108.28 for the fiscal years ended April 30, 1953, 1954, and 1955, respectively. The Commissioner also notes that in the subsequent leasing of the property during the year involved, in an arm's length transaction between strangers, i.e., Costello and the partners, the maximum rental was stated to be 3/4 of the 1 percent of the mutuel handle, which is almost 1/3 of the 2 percent *352 of the mutuel handle which the Commissioner in his determination here has allowed in the case at bar. It would seem apparent on its face that the lease provision requiring the corporation to pay 100 percent of its net profits to the partnership for rental of the property calls for a close scrutiny to determine the true character of the payment and whether it is in excess of a reasonable rental. The leases eliminated any income tax at the corporate level, which is obviously what the interrelated parties were seeking to accomplish. It is not without significance that the increase of rental to 100 percent of the net profits followed the year in which the corporation had net profits. The disposal in 1954 of the remaining 3 years of the lease for $1,035,000 is not conclusive of the amount of reasonable rental in the years before us. In appraising this situation it must be borne in mind that the partnership at the same time offered the 3-year plus the two 5-year renewal periods for a net of $1,385,000, which allocated over the 13-year period would result in a rental of about $106,540 per year, a figure substantially less than the rentals allowed by the Commissioner. Moreover, the partnership *353 reported the payments on the lease as capital gains, a position which, if well taken, would permit substantial adjustments on the amounts to be paid. The petitioners further argue that the corporation stood as an agent of the partnership, and that the way to arrive at a reasonable rental for the property is to determine the amount of the corporation's earnings the partnership would allow the corporation to retain as compensation and for the expense involved in operating the track. This issue was not raised in any of the pleadings. However, our conclusion from the record is that the corporation's operations of the race meetings were the only real operations of business relating to the racing aspects of the property. The corporation made application for and received annual licenses to conduct the race meetings and did conduct those meetings. The corporation was the true operator of the track in that it employed all personnel, paid the license taxes, advertising, purses, for saliva tests for horses, and for photo-finish and totalizator services. The corporation did borrow its money for the pari-mutuel pool with the guarantees made by the individual parties. In regard to the petitioners' *354 suggestion that the partners were responsible for most of the management and improvements of the track, it can as well be said that the same parties were the officers and directors of the corporation, and stockholders as well, and that it is only through such parties that a corporation can function. We cannot sustain the petitioners' view that the corporation was a mere agent. The petitioners' further suggestion that the corporation's capitalization of $17,500 required the partners to supply all the necessary financing for it is not well taken. Any inadequacies which may have existed with respect to the corporation were of the partners making. Moreover, the corporation in the taxable years was an active, operating and successful business. It had large profits and apparently would have been more than able to maintain and arrange its own financing if it had not had all of its profits drained away by its leases with the partnership calling for payments of rental in an unreasonable amount. Upon full consideration of the entire record, we are convinced that the petitioners have not borne their burden of overcoming the correctness of the Commissioner's determination of the deficiencies *355 in regard to this issue. Dividends to Partners Some of the petitioners contend that if we find, as we have, that a portion of the rent for 1954 [2] was excessive and was not deductible as rent, the receipt of that portion was not ordinary income to them, as determined by the Commissioner. Their theory is that those of them who were stockholders of the Corporation were receiving distributions of the corporation taxable as dividends and which, as such, were only taxable to the extent of available earnings and profits. The remainder of the receipts, it is urged, should be taxed as a recovery of capital which should first be offset against their respective cost basis for the stock and the difference taxed as capital gains. It is further urged that all of this adjustment can be reflected in the computations under Rule 50. The principal argument of these petitioners is that the income which the partnership and these petitioners reported as rent for 1954 changed its character to dividends by reason of this Court's validating the Commissioner's determination that the amount was not rent *356 deductible under the statute. The Commissioner relies upon Ruben Simon, 11 T.C. 227, and Healy v. Commissioner, 345 U.S. 278 to freeze the status of the receipts as rents. These cases, however, were not concerned with our present problem of retroactive change in the Character of the income in question. The crucial questions there were whether the parties could retroactively erase the receipt of the income in the earlier year. The Supreme Court and this Court relying upon the well-founded concept of an annual accounting period denied the right to make a retroactive change which would eliminate the income entirely from the year in which it was received. That is not our case. The petitioner relies upon Rev. Rul. 56-233, 1956-1 C.B. 51, which states as follows: Under the Internal Revenue Code of 1939, the character of any item of income realized by a partnership and included in a partner's distributive share is the same as though the partner had realized such item directly from the source from which it was realized by the partnership and in the same *357 manner. See Harry H. Neuberger v. Commissioner, 311 U.S. 83, Ct. D. 1470, C.B. 1940-2, 228; Emil Mosbacher v. United States, 311 U.S. 619; Commissioner v. Jack Jordan Ammann et ux, 228 Fed. (2d) 417; Zelda B. Jennings et al. v. Commissioner, 110 Fed. (2d) 945, certiorari denied, 311 U.S. 704; John Craik v. United States, 31 Fed. Supp. 132; G.C.M. 22491, C.B. 1941-1, 374; and G.C.M. 22461, C.B. 1941-1, 295. Section 702(b) of the Internal Revenue Code of 1954 enacts the same rule for taxable years to which Subchapter K thereof, relating to partners and partnerships, is applicable. See the Senate Finance Committee Report on Section 702 (83d Congress, 2d Session, Senate Report No. 1622, 376). The position expressed in the case of John E. Dockendorff v. United States, 84 Fed. Supp. 372, is not consistent with this rule and will not be accepted by the Internal Revenue Service in the disposition of other cases involving similar factual situations. On brief the Commissioner adheres to the position taken in Rev. Rul. 56-233, *358 but states that it is not applicable to the present situation, without advancing any tenable reason to support his position. His difficulty might stem from the fact that in his quotation of the ruling in his brief the Commissioner omits that part of the ruling which establishes that the concern of the ruling is "the character of any item," rather than "any item" itself. The Commissioner's acceptance of his ruling as otherwise applicable to this case makes unnecessary here a possible pursuit of these provisions of the 1954 Code to adjudicate other possible interpretations of section 702. See, e.g., "Character of Partnership Income" by Bernard Wolfman, N.Y.U. 1961 Institute on Federal Taxation, p. 287. Because of this concession by the Commissioner disposition of such problems as section 702 might present in this regard can await a clear framing of the issue, and briefs concisely directed to it. If we hold, as we do, that the payments to some of the individuals were dividends, the Commissioner strongly urges that in determining earnings and profits available for dividends, interest on any contested deficiencies determined against the corporation is not accruable at the end of each *359 year, but when the disputed liabilities are finally determined. This position, as he admits, is directly contrary to Sidney Stark, 29 T.C. 122. Despite his urging, bottomed primarily on his administrative difficulties resulting from the decision, we are not disposed to reverse it here. It should be noted that the Commissioner did not appeal Sidney Stark, supra. The distributions in question are to be treated as dividends to the extent of the available earnings and profits, which can be computed under Rule 50, and the remainder of such distributions will be a factor in computing taxable capital gains, if any, to the respective petitioners. Capital Gains v. Ordinary Income on Contracts Relating to Lease The partner-petitioners claim that the several contracts entered into between them and the Fairmount Jockey Club, Inc. effected a sale of their September 11, 1953 lease of the raceway from Costello. Ten percent of the stock of the Jockey Club was owned by Bennigsen, one of the partners. The Commissioner has determined that there was no sale, but that the contracts in question were for a sublease of the property. The Commissioner concedes that the *360 papers were couched in terms generally applicable to a sale, but contends that the intention of the parties gathered from the provisions of the lease and all the circumstances surrounding the transaction establish that the real transaction was a sublease. We agree with the Commissioner. There can be no doubt that the intention of the parties is the only criteria in resolving such an issue as the one before us. See Steven Voloudakis, 29 T.C. 1101, affd. 274 F. 2d 209 (C.A. 9); and Commissioner v. Pope, 239 F. 2d 881 (C.A. 1). State law may be helpful in ascertaining the intent, but it is not conclusive in circumstances where the reality of the transaction is the issue. The partnership first cancelled its agreement with the corporate petitioner. The transaction in question was then evidenced by two instruments. One made the "Assignment" of the original lease of September 17, 1954 from the partners to the Jockey Club. It, by its terms, was subject to an "Agreement" of the same date. Both of these instruments setting forth the transaction, though in *361 substantial form evidencing a sale, nevertheless display an intention to the contrary. Calling the transaction a "sale" does not make it one, if in fact it is something different. [3] The partners did not purport to transfer the entire lease, but reserved to the partnership the inherent options to renew the original lease (which had three years to run) for two terms of five years each. [4] The Jockey Club was given an option to "purchase" the renewal options at a later date, at alternative figures of $600,000, or $700,000, depending on whether the payment was made in two equal installments or over a period of five years. The instrument in no manner relieved the partners of their liability to Costello, who was not a party to the transaction, and did not give it his approval. Under Article III of the September 17, 1954 "Agreement" the Jockey Club could make an outright cash purchase but it was then required to deliver a formal release from Costello, the lessor, of all of the petitioners' obligations as lessees under the original lease. The partners were still the lessees of the property and still *362 remained liable to Costello, their landlord. [5] The partners also retained effective rights of re-entry with a right to retake all the properties and interest involved on default of the payments to petitioners or to Costello on petitioners' liability under the original lease. The agreement also provided for a "vendor's lien" on such properties and interests, to secure the payments. The "Assignment" on September 19, 1957, pursuant to the exercise by the Jockey Club of its option in the September 17, 1954 agreement, actually could have covered nothing more than the remaining periods under the lease available to the petitioners by reason of their renewal option in their lease with Costello. The September 19, 1957 assignment nonetheless again recites that it is a conveyance of all right, title and interest in the September 11, 1953 lease with Costello. However, in reality, we deem it as nothing more than an anticipated ten-year *363 extension of the sublease for which the partnership was paid $700,000. Here again Costello is not shown to have released the partners from their direct liability to him. There is a provision for the Jockey Club to release the partners from liability under the lease but that is but a matter of indemnity and does not vitiate the lessor-lessee arrangement between the partners and Costello. But even as to this, there is no showing that indemnity agreements were ever given. In this second "Assignment" as in the first, the effective re-entry provisions were continued. The transactions though somewhat differently cast, when correctly viewed are both subleasing arrangements. Situations of this sort are often not free from doubt, but considering all the evidence, the transactions as an entirety, the fact that the partnership returns for 1954 through 1958 stated that its principal activity was "Rental", (which returns were signed by partners after being prepared by their experienced accountant who was in control of the partnership's books and records and was also acquainted with the transaction with Jockey Club), and the fact that the *364 petitioners have the burden of proving that the Commissioner's determination is erroneous, we conclude that the transaction in 1957 was a sublease and the payments to the petitioners were rent taxable as ordinary income. Testimony that no consideration was given to subleasing the property in the negotiations between the partnership and the Jockey Club is not convincing. Bennigsen did not appear to be too certain that such was the case when he testified and he and Michael Parish, who also testified, were not without self interest in the resolution of this question. While Bennigsen was also a stockholder of the Jockey Club, it is possible that it was amortizing the payments in question. Such a conclusion makes it unnecessary to consider the petitioners' argument based upon a formalized breakdown of the various steps of the transaction and the character the various property interests might have under such circumstances. Our conclusion that there was a subleasing and the payments made under the transaction between the partnership were rentals is dispositive of the issue present in the petition in Docket No. 81751. The exclusion of these rentals from their longterm capital gains will *365 limit their allowable capital losses to $1,000. Section 1211(b), Internal Revenue Code of 1954. These petitioners do not contend otherwise on brief. The petitioners in Docket Nos. 81571, 81714, 81764, 81765, 81766, and 82506 have failed to submit any evidence relating to the issue of additions to tax under section 6654 of the 1954 Code, for underpayment of estimated tax, and this issue is decided for the Commissioner. Similarly, the Commissioner is sustained in Docket No. 81819 in his determination of addition to tax under section 294(d)(1)(A) of the Internal Revenue Code of 1939, for failure to file a declaration of estimated tax. The petitioners against whom transferee liability is claimed concede this liability in their briefs if, as is the case, the excess rental issue is decided for the Commissioner. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Melville Bitner, Trustee, Docket No. 70279; Festus Stacy, Docket No. 70280; William C. O'Mara, Docket No. 70318; Claire O'Mara, Docket No. 70319; Ruth P. Petersen, Docket No. 70320; Adaline P. Winsor, Docket No. 70321; Michael H. Parish, Docket No. 70322; Isabel M. Vance, Docket No. 70323; Sherry Young, Docket No. 70324; Edwin C. Moon, Docket No. 70325; Edwin C. Moon, Trustee, Docket No. 70326; John C. Moon, Docket No. 70327; June P. King, Docket No. 70328; Vera J. Newman, Docket No. 70329; Ray C. Bennigsen, Docket No. 70330; E. R. Casteel and Maud Casteel, Docket No. 70331; Lucille P. McBeth, Docket No. 70332; Russell Casteel, Docket No. 70333; Daniel C. Parish, Docket No. 70352; William J. Parish, Jr., Docket No. 70353; Hubert M. Schaefer Trust, Willibald Schaefer, Trustee, Docket No. 70354; Russell R. Casteel and Katherine Casteel, Docket No. 71924; Richard E. King and June P. King, Docket No. 81571; William C. O'Mara and Nora S. O'Mara, Docket No. 81713; Wayne W. McBeth and Lucille P. McBeth, Docket No. 81714; Charles K. Winsor and Adaline P. Winsor, Docket No. 81715; Roy F. O'Mara and Claire L. O'Mara, Docket No. 81749; John C. Moon and Marion A. Moon, Docket No. 81750; Edwin C. Moon and Martha H. Moon, Docket No. 81751; Sherry M. Young, Docket No. 81762; Ludwig T. Petersen and Ruth P. Petersen, Docket No. 81763; M. H. Parish and Mae Parish, Docket No. 81764; Dan Parish and Gladys M. Parish, Docket No. 81765; Vera J. Newman, Docket No. 81766; Roy S. Newman and Vera J. Newman, Docket No. 81767; William J. Parish, Jr. and Nancy L. Parish, Docket No. 81818; William J. Parish, Jr., Docket No. 81819; M. H. Parish and Mae Parish, Docket No. 82143; Richard E. King and June P. King, Docket No. 82144; Charles K. Winsor and Adaline P. Winsor, Docket No. 82202; Roy F. O'Mara and Claire L. O'Mara, Docket No. 82203; William C. O'Mara and Nora S. O'Mara, Docket No. 82204; Wayne W. McBeth and Lucille P. McBeth, Docket No. 82481; Edmund R. Casteel and Maud L. Casteel, Docket No. 82482; Dan Parish and Gladys M. Parish, Docket No. 82506; Virlee Stacy Trust, Melville Bitner, Trustee, Docket No. 82517; Ray C. Bennigsen and Veronica Bennigsen, Docket No. 82518; John C. Moon and Marion A. Moon, Docket No. 82519; Irene Stacy Trust, Melville Bitner, Trustee, Docket No. 82520; J. Clair Vance and Isabel M. Vance, Docket No. 82570; Ludwig T. Petersen and Ruth P. Petersen, Docket No. 82617; Vera J. Newman, Docket No. 82667; William J. Parish, Jr. and Nancy L. Parish, Docket No. 82923; Willibald Schaefer and Cecile L. Schaefer, Docket No. 85545; J. Clair Vance and Isabel M. Vance, Docket No. 88158.↩
*. Made during years 1948 and 1949. No other expenditures made in 1949.↩
2. The only pertinent year as to this issue covered by the respective notices of deficiency.↩
3. See: Commissioner v. P. G. Lake, Inc. 356 U.S. 260; Oesterreich v. Commissioner, 226 F. 2d 798↩. 4. See: Waller v. Commissioner, 40 F. 2d 892↩. 5. See: Steven Voloudakis, 29 T.C. 1101, 1108↩, supra.