**Walburga OESTERREICH, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 13924.**

United States Court of Appeals
Ninth Circuit.

Oct. 29, 1955.

Charles I. Rosin, Los Angeles, Cal., for appellant.

Murray M. Chotiner, Albert Jack Chotiner & Russell E. Parsons, Beverly Hills, Cal., for amicus curiae Wilshire Holding Corp.

H. Brian Holland, Asst. Atty. Gen., Joseph F. Goetten, Ellis N. Slack, Sp. Assts. to Atty. Gen., John Potts Barnes, Chief Counsel, Internal Revenue Service, Chicago, Ill., for respondent.

Before FEE and CHAMBERS, Circuit Judges, and LING, District Judge.

LING, District Judge.

This case is here on petition to review a decision of the Tax Court relating to a deficiency assessment. The following facts are not in dispute.

Petitioner, Walburga Oesterreich, acquired three adjoining lots, 552, 553 and 554, in January, 1926. One of the lots was on the corner of Wilshire Boulevard and Hamilton Drive in Beverly Hills, California.

Wilshire Amusement Corporation was incorporated in 1929 by Albert H. and Albert J. Chotiner, father and son, for the purpose of building a motion picture theatre. They directed a real estate broker, operating in Beverly Hills, to find a suitable location which they could lease and on which they could construct a theatre. The broker learned from Walburga that she would be willing to enter into a lease for the three vacant lots which she owned and he arranged a meeting between the Chotiners and Walburga. After negotiations, Walburga and Wilshire Amusement Corporation entered into an agreement entitled "lease" dated September 11, 1929. The Chotiners decided, in the course of the negotiations, that additional land would be needed for the theatre which they desired to build and for that reason Wil-

shire Amusement Corporation purchased lot 555 and the northerly 40 feet of lot 556 at a total cost to it of $19,650. Wilshire conveyed that land to Walburga in the fall of 1929.

Walburga is referred to as lessor and Wilshire Amusement Corporation is referred to as lessee throughout the agreement of September 11, 1929. The "lease" agreement provides for payments called rent to be paid by lessee, Wilshire Amusement Corporation to lessor, the taxpayer. The lessee agreed to pay the lessor total rent of $679,380 payable in monthly installments for a period of 67 years and eight months beginning September 1, 1929 and ending the last day of April, 1997. The rental schedule provided for an annual rental of $7,500 for the first 10 years, $12,000 for the succeeding 18 years and amounts becoming progressively smaller so that the rental for the 68th year was $7,500. The lessee agreed to pay all taxes and similar charges on the property. The lessee agreed to erect a new building on the premises to cost not less than $300,000 and to be completed not later than July 1, 1930. The lessor agreed to join in the execution of notes or debentures and in a deed of trust or mortgage covering the leased premises to secure a loan not to exceed $225,000 to be used in constructing the building. The lessee agreed to take out adequate fire insurance on the building and insurance to protect lessor from claims arising out of the use of the premises. The agreement states that the lessee proposes to sublease a portion of the building for theatre purposes. The lease could be assigned by the lessee upon the terms stated therein and such an assignment would release the lessee of further obligations under the lease. The lessor could declare the lease terminated in case of default continuing longer than a period stated in the lease. The lessee had the right, but was not bound, to tear down any building which might be built on the premises for the purpose of reconstruction in accordance with the terms of the lease should the original building become obsolete or not suited to the purpose of

the lessee. Any such replacement was to cost not less than $325,000.

One paragraph of the lease provided that when the lease expired and all conditions met, the

> "lessor promises and agrees that she will then, upon the payment to her of the further sum of ten dollars ($10.00) in hand, convey or cause to be conveyed by grant deed to the Lessee free and clear of all encumbrance, all of the real property herein leased, without further or other consideration."

The agreement was recorded in the Official Records of Los Angeles County.

Wilshire Amusement Corporation changed its name to Wilshire-Hamilton Properties, Inc., shortly after September 11, 1929. Wilshire Holding Corporation succeeded to the interest of Hamilton under the agreement of September 11, 1929, in August, 1935.

Wilshire Holding Corporation paid the taxpayer $12,000 in each of the years 1945 and 1946 in accordance with the agreement and entered the amounts so received as rental expense. The taxpayer, on her returns for 1945 and 1946, reported the $12,000 as income from rents. She received a letter from an Internal Revenue Agent in Charge indicating over assessments in her income tax for 1945 and 1946, and enclosing a report in which it was stated that she had reported rental income of $12,000 for the years 1945 and 1946, but investigation showed that the agreement under which these payments were made was "not a lease, but in effect an installment sale of realty under Section 44(b) of the Internal Revenue Code [26 U.S.C.A. § 44," and she overstated her income for each year by $6,206.91 in that connection. She received another letter from the same source dated July 26, 1949, reversing the previous conclusion and stating that the rents were correctly reported as income on her previous tax returns.

The Commissioner determined a deficiency in income tax of $141.16 for 1946 against Walburga Oesterreich and deficiencies against Wilshire Holding Corporation of $1,584 in declared value excess profits tax, $3,097.83 in excess profits tax, for 1945, and $2,798.20 in income tax for 1946.

The Tax Court entered its decision sustaining the Commissioner's determination of deficiency in the taxpayer's income tax for the year 1946.

■ There is only one issue presented by this case. Is petitioner entitled to treat "rental" payments made by "lessee" as long term capital gains or must she treat them as ordinary income? Conversely, is lessee, the Wilshire Holding Corp., entitled to treat these payments as a deductible business expense as defined by Int.Rev.Code Sec. 23(a) (1) (A), 26 U.S.C.A. § 23(a) (1) (A) or merely as non-deductible capital expenditures? The sole issue, therefore, is whether the agreement is a lease or a contract for the sale of land. The courts, in making determinations of this sort, commonly consider the intent of the parties and the legal effect of the instrument as written.

■■ It seems well settled that calling such a transaction a "lease" does not make it such, if in fact it is something else. Judson Mills, 1948, 11 T.C. 25; Robert A. Taft, 1938, 27 B.T.A. 808. To determine just what it is the courts will look to see what the parties intended it to be. Benton v. Commissioner, 5 Cir., 1952, 197 F.2d 745. Both petitioner and Wilshire Holding Corp. have at all times referred to the agreement as a lease and they have treated the payments as rental income and rental expense respectively. For this reason, perhaps, the Tax Court assumed that the parties intended a lease. However, the test should not be what the parties call the transaction nor even what they may mistakenly believe to be the name of such transaction. What the parties believe the legal effect of such a transaction to be should be the criterion. If the parties enter into a transaction which they honestly believe to be a lease but which in actuality has all the elements of a contract of sale, it is

a contract of sale and not a lease no matter what they call it nor how they treat it on their books. We must look, therefore, to the intent of the parties in terms of what they intended to happen.

It is clear that it was intended that title to the premises was to pass to lessee at the end of the 68 year term. The testimony of the parties makes this explicit. Therefore, if the only test in determining whether it was a sale or lease was the passing of title, the parties intended a sale and not lease.

Testimony was offered to the effect that petitioner wanted the bulk of the consideration for the "lease" as soon as possible so that she could enjoy the money during her lifetime. Consequently, the agreement which provided for a tapering off of the rental payments in the later years was tailored to suit her needs and to what the lessees could afford to pay. This was the intent of the parties and this is what went into the agreement. Here we see that what the parties intended and the legal effect of the transaction were one and the same, so we should not consider the intent of the parties apart from the legal effect of the agreement.

The question before us remains whether petitioner is entitled to treat her rental payments as long term capital gains rather than rental income and conversely whether Wilshire Holding Corporation is entitled to deduct the payment as rental expense as defined by Sec. 23(a) (1) (A) which provides as follows:

"In computing net income there shall be allowed as deductions:

"(a) Expenses

"(1) Trade or Business Expenses

"(A) In General. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including * * * rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken *or is*

*not taking title or in which he has no equity.*" (Emphasis supplied.)

If Wilshire Holding Corporation is either taking title to the property or has acquired an equity, it cannot treat the payments from Wilshire as rental income. It is important to note that these two provisions of Sec. 23(a) (1) (A) are stated in the alternative and the deduction cannot be availed of if Wilshire Holding Corporation has brought itself into either category prohibited by statute. DuPont v. Deputy, D.C.Del. 1938, 22 F.Supp. 589, 599, modified on other grounds, 3 Cir., 1939, 103 F.2d 257, certiorari granted, 1939, 308 U.S. 533, 60 S.Ct. 89, 84 L.Ed. 449, reversed on other grounds, 1940, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416. In Helser Machine & Marine Works, 1939, 39 B.T.A. 644, 645, 646, the court stated,

It is not necessary to hold that by payment of the rental petitioner acquires an "equity", for that word is not easy to define; it is enough that the lease provides a right in the petitioners to take title to the premises for which the rental was paid.

This language was cited with approval in Judson Mills, 1948, 11 T.C. 25, at page 33. See also In re Rainey, D.C. Md. 1927, 31 F.2d 197 (non-tax). We find, therefore, that the Tax Court was in error for it ignored this alternative ground of taking title and based its decision on the ground that it believed Wilshire Holding Corporation had not yet acquired an equity in the premises.

There can be no doubt that Wilshire Holding Corporation is acquiring title to the premises. At the expiration of the lease it can acquire the premises now worth $100,000 for the token consideration of $10. Although there have been cases holding that a mere option to buy at the expiration of the time period does turn a lease into a contract of sale, Benton v. Commissioner, supra, 197 F.2d 745; Indian Creek Coal & Coke Co., 1931, 23 B.T.A. 950; Haverstock, 1928, 13 B. T.A. 837, it should be noted that in all of these cases, the option price consti-

tuted full consideration for the premises or goods acquired. In each of these cases it was always questionable whether or not the options would be exercised. Here there is virtually no question of this, for not only will Wilshire Holding Corporation acquire valuable land for a mere $10 but it will forfeit a $350,000 building now on the premises to the lessor if it does not decide to pay the $10 and take title. The testimony clearly shows that the Wilshire Holding Corporation during all of the original negotiations was very much concerned with what would happen to its building and the land after the lease expired and would not have agreed to the "lease" unless it provided that title would vest in Wilshire.

Another factor leading to the conclusion that the parties at the time of the transaction intended a sale is that the schedule of payments under the so-called lease was not commensurate to the benefit derived by Wilshire from the occupancy and use of the land, for instead of rising toward the end of the lease as the land on Wilshire Boulevard became more valuable the payments decreased.

██ The alternative criterion under Sec. 23(a) (1) (A) which would prevent Wilshire Holding Corporation from treating the payments as a business expense is whether an equity in the property was acquired. The Tax Court in applying this test held that since the amount due on the remaining portion of the lease greatly exceeded the appraisal value of the property, Wilshire Holding Corporation had not yet acquired an equity. We, however, do not believe that this method of determining whether an equity has been acquired is correct. From 1929 to 1946 Wilshire Holding Corporation paid approximately $160,000 to the lessor. In 1997 it will acquire property appraised at $100,000 in 1946 and worth perhaps ten times as much by 1997. Certainly a part of each payment is going toward the acquisition of this land and to this extent Wilshire Cor-

poration does have an equity. In Chicago Stoker Corp., 1950, 14 T.C. 44, the court said that if the payments made under the "lease" are large enough to exceed the value of the property less depreciation, the lessee is receiving an equity in the property. Although the Stoker case is distinguishable on its facts, the same principle should apply here.

However, even if the Tax Court was correct in holding that Wilshire has not acquired an equity, the alternative ground that they are taking title to the property is sufficient to disqualify the "rental" payments from being treated as a business expense.

Looking at this transaction from a long range view we find that if the opinion of the Tax Court is affirmed, Wilshire Holding Corporation, at the expiration of the "lease", will have acquired a very valuable piece of property for payments written off entirely as business expense while petitioner will have, in effect, sold a valuable piece of property without having been able to treat the proceeds as a long term capital gain.

██ We are of opinion that the Tax Court erred in treating the question of intention of the parties as one of fact collateral to the written instrument. The document was not ambiguous, and evidence as to surrounding circumstances was not required to explain it. The intention of the parties, as expressed in the instrument, was cardinal, as has been said above. The document has here been construed in the light of the applicable statute. No question of fact was involved. One who contracts to purchase real property acquires an equity therein immediately on the signing of the contract to purchase and taking possession. This equity increases with every payment. No comparison of the value of the realty and the amount of rental paid at any given time has any validity.

The decision of the Tax Court is reversed.