No. 57,951

STATE OF KANSAS, *ex rel.*, Nick A. Tomasic, Wyandotte County District Attorney, Kansas City, Kansas, *Relator*, v. KANSAS CITY, KANSAS, a Municipal Corporation Organized and Existing Under the Laws of the State of Kansas, *Respondent*, and CITY OF KANSAS CITY, KANSAS, WYANDOTTE COUNTY JOINT PORT AUTHORITY, A PUBLIC BODY CORPORATE AND POLITIC, *Respondent*.

(701 P.2d 1314)

574

Opinion filed June 21, 1985.
(For original opinion filed April 22, 1985, see 237 Kan. 164, 698 P.2d 382.)

*Nick A. Tomasic,* district attorney, argued the cause and was on the brief for the relator.

*Robert J. Watson,* city attorney, and *Norman E. Gaar,* of Gaar & Bell, of Overland Park, argued the cause for the respondents, and *Jody Boeding,* assistant city attorney, *Patricia K. Hirsch,* of Gaar & Bell, of Overland Park, and *John F. Steineger, Jr.,* of Kansas City, were with them on the brief for respondent Kansas City, Kansas, and *John P. Biscanin,* of Kansas City, was with them on the brief for the respondent City of Kansas City, Kansas, Wyandotte County Joint Port Authority.

The opinion of the court was delivered by

SCHROEDER, C.J.: This is an original action in quo warranto brought by Nick A. Tomasic, Wyandotte County District Attorney, (relator) challenging the constitutionality of K.S.A. 79-201a *Second,* as amended, and challenging the legality of certain actions taken or proposed to be taken by the City of Kansas City, Kansas and the City of Kansas City, Kansas—Wyandotte County Joint Port Authority (respondents) under an Inducement Agreement with General Motors Corporation (GM).

Due to the urgency of the matter and public interest involved, this action was given a preferential setting in our court. This case has been briefed thoroughly by the parties and was argued on April 2, 1985. This opinion supplements our brief opinion announcing the decision of the court on April 22, 1985, in *State ex rel. Tomasic v. City of Kansas City,* 237 Kan. 164, 698 P.2d 382.

The Inducement Agreement between GM and the City and Port Authority relates to the acquisition and development of an industrial plant for the assembly and manufacture of vehicles and automotive components in the Fairfax District of Kansas City, Kansas. Under the agreement the plant would be *leased* to GM and financed through the issuance by the City of Kansas City, Kansas of industrial revenue bonds (IRB's).

The project site, consisting of approximately 568 acres of land, is presently owned in part by the City of Kansas City, Kansas and in part by the Joint Port Authority. That portion owned by the City is presently used for airport purposes and is operated by the Port Authority under a lease agreement with the City. That

portion owned by the Port Authority is the site of a proposed industrial park. The Port Authority acquired its interest in the project site for nominal consideration pursuant to a conveyance from the City in 1979. To provide the project site, the City and Port Authority propose to close the airport, and the Port Authority proposes to convey its interest in the site to the City for nominal consideration.

In furtherance of its plans for development, the City of Kansas City, Kansas, has adopted a resolution of intent to issue approximately $775 million aggregate principal amount of IRB's to finance the project, pursuant to K.S.A. 12-1740 to 12-1749a inclusive, as amended (the Economic Development Revenue Bond Act). The City has also adopted a resolution authorizing the City to enter into the Inducement Agreement with GM.

The Inducement Agreement provides for the City to issue the bonds to provide funds necessary to finance the acquisition, construction, and installation of the facilities. Prior to issuing the bonds, the City and GM will enter into a *lease-purchase agreement* providing for the lease of the facilities and land to GM for an initial term ending on the date of final maturity of the bonds. The proposed *lease agreement* will provide for rental payments by GM and give GM an option to purchase the land and facilities for $100 after or contemporaneous with full payment and retirement of the bonds. The bonds will be of such nature and tenor as to be saleable to third parties. GM may purchase a substantial portion of the bonds for its own account. In addition to rental payments as set forth in the proposed lease agreement, GM will make payments in lieu of taxes in accordance with a schedule attached to the Inducement Agreement to be transmitted to the county treasurer and distributed to appropriate taxing jurisdictions.

The City proposes to proceed with the issuance of the bonds under the Economic Development Revenue Bond Act to finance the project. As structured, the project is intended to be exempt from property and ad valorem taxes in accordance with K.S.A 79-201a *Second,* as amended.

General Motors is one of the largest industrial employers in Kansas City and Wyandotte County, Kansas, operating an automotive assembly plant in the Fairfax Industrial District since 1948. During the past few years, GM's Fairfax plant has ac-

counted for approximately 25% of all Wyandotte County's manufacturing employment. In the year 1983, the Fairfax plant employed approximately 5,100 employees, paid real and personal property taxes of approximately $1.2 million, had a total plant payroll of approximately $190 million, and locally purchased goods and services of a value of approximately $60 million.

Due to a number of factors (including inefficient and cramped manufacturing facilities, and the need for expansion and modernization of those facilities), the existing Fairfax plant is nearly obsolete and GM plans to close the plant in the near future. If the new plant is built, it will have the potential to employ approximately 5,465 workers and have a total annual payroll of approximately $204 million at current wage rates. In addition, the construction of the new plant will create employment for approximately 3,200 workers, with an estimated construction payroll, over a construction period of approximately 30 months' duration, of $200 million. The economic importance of such a plant to Kansas City, Kansas, and the State of Kansas is readily apparent; however, controversy has arisen over whether the tax exemption statute involved is constitutional.

The general issues are: (1) Whether the tax exemption statute, K.S.A. 79-201a *Second,* and the "payment in lieu of taxes" statute, K.S.A. 12-1742, are unconstitutional in whole or in part; and (2) whether the City of Kansas City, Kansas and the Port Authority are acting contrary to the law of the State of Kansas by entering into certain specific provisions of the Inducement Agreement.

At the outset we note the Economic Development Revenue Bond Act was enacted in 1961. The constitutionality of that Act was challenged and upheld in *State, ex rel., v. City of Pittsburg,* 188 Kan. 612, 364 P.2d 71 (1961). K.S.A. 79-201a *Second,* the constitutionality of which is challenged in this action, was enacted in 1975. It provides statutory property tax exemption for property used exclusively by the state, or property owned by the state if it is used for a governmental or proprietary function for which bonds may be issued to finance the same. It further provides that if IRB's are issued pursuant to the Economic Development Revenue Bond Act, the financed property is to receive a ten-year property tax abatement. The constitutionality

of this statute has never been challenged. Between 1961 and 1983, there were 1,717 IRB issues in this state totalling $4.475 billion. Dept. of Economics, *Analysis of Industrial Revenue Bonds Issued in Kansas 1961-1984.* The relator does not address what would happen to the industries so financed and now enjoying tax exemptions if this court were to find the statute unconstitutional.

## I.

Article 11, § 1 of the Kansas Constitution provides:

"The legislature shall provide for a uniform and equal rate of assessment and taxation, except that the legislature may provide for the classification and the taxation uniformly as to class of motor vehicles, mineral products, money, mortgages, notes and other evidence of debt or may exempt any of such classes of property from property taxation and impose taxes upon another basis in lieu thereof. All property used exclusively for state, county, municipal, literary, educational, scientific, religious, benevolent and charitable purposes, and all household goods and personal effects not used for the production of income, shall be exempted from property taxation."

It is contended that K.S.A. 79-201a *Second* violates Kan. Const., art. 11, § 1 because the exemption for industrial revenue bond (IRB) property does not have a public benefit or purpose and runs afoul of the uniform and equal assessment and taxation requirement.

In *State ex rel. Tomasic v. Kansas City, Kansas Port Authority,* 230 Kan. 404, 411-12, 636 P.2d 760 (1981), this court, in discussing the power of the legislature to exempt property from taxation, stated:

"Under the general rule all property is subject to taxation unless specifically exempted. *Topeka Cemetery Ass'n v. Schnellbacher,* 218 Kan. 39, 41-42, 542 P.2d 278 (1975). *Property which is subject to taxation is taxed at a uniform and equal rate. State ex rel. Stephan v. Martin,* 227 Kan. 456, 608 P.2d 880 (1980); *Gunkle v. Killingsworth,* 118 Kan. 154, 156, 233 Pac. 803 (1925); *Sumner County v. Wellington,* 66 Kan. 590, 593, 72 Pac. 216 (1903). However, tax exemptions are constitutionally permissible. One type of tax exemption is the constitutional exemption which demands the property be 'used exclusively' for specified purposes. *Topeka Cemetery Ass'n v. Schnellbacher,* 218 Kan. at 42; *Washburn College v. Comm'rs of Shawnee Co.,* 8 Kan. 344, 349 (1871). The constitution does not provide, however, that other exemptions may not be made. *City of Harper v. Fink,* 148 Kan. 278, 280, 80 P.2d 1080 (1938); *Gunkle v. Killingsworth,* 118 Kan. at 156. *The legislature may provide other statutory exemptions if such exemptions have a public purpose and promote the general welfare. Topeka Cemetery Ass'n v. Schnellbacher,* 218 Kan. at 42; *State, ex rel., v. Board of Regents,* 167 Kan. 587, 596, 207 P.2d 373 (1949); *Sumner County v. Wellington,*

66 Kan. at 593. Such statutory exemptions may be broader than the constitutional ones. *State, ex rel., v. Board of Regents,* 167 Kan. at 595-96, *Alpha Tau Omega v. Douglas County Comm'rs.,* 136 Kan. 675, 684, 18 P.2d 573 (1933). 'Within the scope of legislative power, the legislature itself is the judge of what exemptions are in the public interest and will conduce to the public welfare.' *Gunkle v. Killingsworth,* 118 Kan. at 157. Accord, *State, ex rel., v. Board of Regents,* 167 Kan. at 596." (Emphasis added.)

It is not contended that the IRB property will be "used exclusively" for one of the constitutionally enumerated exemptions. Therefore, the exemption, if valid, must meet the criteria for statutory exemptions.

In ruling on the constitutionality of statutory exemptions, this court has generally considered four key elements: (1) whether the exemption furthers the public welfare, *State, ex rel., v. Board of Regents,* 167 Kan. 587, 207 P.2d 373 (1949); (2) whether the exemption provides a substantial, peculiar benefit, *Alpha Tau Omega v. Douglas County Comm'rs.,* 136 Kan. 675, 18 P.2d 573 (1933); (3) whether the exemption provides for large accumulations of tax-exempt property; and (4) whether the exemption is an improper or preferential classification of property, *State, ex rel., v. Board of Regents,* 167 Kan. 587.

As a general rule of constitutional law, courts have been reluctant to rule on public policy matters since these involve legislative deliberation and judgment. This court stated in *Gunkle v. Killingsworth,* 118 Kan. 154, 157, 233 Pac. 803 (1925), "[w]ithin the scope of legislative power, the legislature itself is the judge of what exemptions are in the public interest and will conduce to the public welfare." Therefore, in determining whether K.S.A. 79-201a *Second* was designed to promote the public welfare, we must follow a policy of judicial restraint unless we find the judgment of the legislature was "entirely devoid of a rational basis." *State, ex rel., v. Board of Regents,* 167 Kan. at 596.

The purpose of the Economic Development Revenue Bond Act is stated in K.S.A. 12-1740 as follows:

"It is the purpose of this act to promote, stimulate and develop the general welfare and economic prosperity of the state of Kansas through the promotion and advancement of physical and mental health, industrial, commercial, agricultural, natural resources and of recreational development in the state; to encourage and assist in the location of new business and industry in this state and the expansion, relocation or retention of existing business, industry and health development; and to promote the economic stability of the state by providing

greater employment opportunities, diversification of industry and improved physical and mental health, thus promoting the general welfare of the citizens of this state by authorizing all cities and counties of the state to issue revenue bonds."

This court, in *State, ex rel., v. City of Pittsburg*, 188 Kan. at 619, found that the Economic Development Revenue Bond Act was constitutionally valid because "the encouragement of industrial development so as to promote the general welfare of the citizens of the state, is a public purpose and the public policy." By creating a statutory exemption from ad valorem property taxes for IRB property, the legislature clearly sought to further this same "general welfare" purpose. Therefore, we find the Act clearly reflects the legislature's concern for economic growth such that, "[t]he aim of the act is a beneficent one, manifestly enacted to advance a policy, coupled with a public interest and to accomplish a public purpose," *Gunkle v. Killingsworth*, 118 Kan. at 156. Therefore, the first requirement of furthering the public welfare has been met.

The second requirement of a statutory tax exemption is that it must be justified and upheld upon the theory of peculiar benefits received by the state from the property exempted. As we have stated, the legislature has made the determination that the public welfare would benefit from the encouragement of industrial and other economic activities by private enterprise in the state and that this may be accomplished through the issuance by cities and counties of IRB's. Such a finding by the legislature persuaded this court to uphold an exemption in *State, ex rel., v. Joslin et al.*, 116 Kan 615, 617, 227 Pac. 543 (1924), wherein we stated:

"This decision of the legislature, having been made in the exercise of its proper functions and being based upon grounds that a court cannot pronounce to be capricious or without foundation in reason, is beyond judicial interference."

The relator maintains that the State of Kansas receives no more substantial, peculiar or direct benefit from commercial property financed with IRB's, and exempt from taxation under K.S.A. 79-201a *Second,* than from any other commercial property. We disagree. The simple fact is that many industries would be unable to construct plants in this state due to the costs of construction and property taxes if it were not for cities' and counties' ability to offer the inducements of revenue bond funding and ten-year tax abatement. Therefore, the people of the state

are receiving a "substantial, peculiar and direct benefit" by these statutes which bring new industries into the state, thus creating economic growth and providing a means of livelihood for its citizens.

A third touchstone by which this court determines the constitutional validity of a statutory exemption is whether the exemption will result in large accumulations of exempt property. As this court stated in *Wheeler v. Weightman,* 96 Kan. 50, 68, 149 Pac. 977 (1915):

"Such exemptions [statutory] must rest on the definite basis of promoting the public welfare in some peculiar and substantial way, *and even then they can not be tolerated to the extent of building up large accumulations of favored property which would disturb general equality and uniformity."* (Emphasis added.)

A tax abatement under K.S.A. 79-201a *Second* is for a period of ten years. At the end of that period, the tax base of the City will be increased. During the ten-year period of tax abatement, the City will receive benefits of increased employment and increased economic activity. The governing body of the city or county requesting the tax exemption will make specific findings that the entity's economy will be enhanced by bringing in the new industry. Such findings will assure that the general public purpose of the Economic Development Revenue Bond Act, as enumerated by the legislature, will be served by the project. The determination by the legislature—evidenced through enactment of the exemption—is that the exemption will not ultimately result in overly large accumulations of exempt property. This is a question of public policy with which this court will not interfere. *State, ex rel., v. Board of Regents,* 167 Kan. at 597.

Finally, we must determine whether the statute constitutes an improper or preferential classification of property. The relator argues that the classification discriminates among private commercial ventures based on the type of financing which the owners of that venture obtain, and cites cases relating to classifications among types of taxpayers. See *M. & M. Rly. Co. v. Champlin, Treas.,* 37 Kan. 682, 16 Pac. 222 (1887); and *State ex rel. Stephan v. Martin,* 227 Kan. 456, 608 P.2d 880 (1980).

The tax exemption under K.S.A. 79-201a *Second* is based on the ownership of the property by the municipality, not on the basis of what type of entity leases the property. Under K.S.A. 12-1740 *et seq.,* any entity may become a lessee of IRB property

as long as the city or county determines that the purpose of the Act would be served by the application of its terms to the particular project.

Moreover, we find that language used by this court in *State ex rel. Tomasic v. Kansas City, Kansas Port Authority*, 230 Kan. at 413, in upholding the constitutionality of K.S.A. 12-3418, is applicable to the case at bar:

"The legislature has granted these exemptions for purposes within the public interest and all taxing subdivisions are affected alike. All bear the burden of decreased revenue during the period of exemption, all share in any payment in lieu of taxes, and all enjoy increased revenues subsequent to the exemption period. Not to be overlooked is the massive expenditure of money for materials and services, including labor, in the local community resulting in economic activity that will generate additional tax revenues for all units of government."

Accordingly, we hold that the ten-year IRB tax exemption, found in K.S.A. 79-201a *Second*, has a public benefit and purpose and complies with the "uniform and equal assessment and taxation" requirement of art. 11, § 1, of the Kansas Constitution.

## II.

K.S.A. 79-201a *Second* is next challenged as violative of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States, § 2 of the Kansas Bill of Rights and art. 2, § 17, of the Kansas Constitution.

The relator first contends that K.S.A. 79-201a *Second* violates the constitutional requirement that all laws of a general nature must apply uniformly throughout the state within the meaning of art. 2, § 17, of the Kansas Constitution because: (1) it does not provide an exemption for property which is privately financed; (2) the exemption is not self-executing and, therefore, some cities and counties may elect not to apply for the exemption; and (3) if the exemption has been granted, the city or county may then decide whether or not to exact payments in lieu of taxes. Therefore, the argument goes, businesses in one part of the state may pay full property taxes while businesses in another part of the state may pay only payments in lieu of taxes or no taxes at all, resulting in a "nonuniform" application of the law.

In *Stephens v. Snyder Clinic Ass'n*, 230 Kan. 115, 631 P.2d 222 (1981), we held that the "uniformity" requirement of art. 2, § 17, relates to geographic uniformity *only*. Therefore, unless it is shown that the exemption lacks geographical uniformity, art. 2,

§ 17, is not applicable to constitutional challenges based upon a denial of equal protection of the laws.

We find that K.S.A. 79-201a *Second* does not lack geographical uniformity. Every city or county in the state which asserts an exemption from taxation for IRB property must go through the procedure of filing an application with the Board of Tax Appeals pursuant to K.S.A. 79-213. No city or county is excluded from this procedure. Likewise, every city or county which receives tax-exempt status for its IRB property has the option of requiring payments in lieu of taxes under K.S.A. 12-1742. The fact that some cities will forego applying for the tax exemption or will not exercise the option of requiring "payments in lieu of taxes" does not affect the geographic uniformity of the application of the statute.

The relator also challenges the rational basis for the classification the legislature has made between projects financed by the proceeds of IRB's and those privately financed.

In *State ex rel. Tomasic v. Kansas City, Kansas Port Authority*, 230 Kan. 404, this same challenge was made to K.S.A. 12-3418, which allows for ten-year tax exemptions for property acquired by port authorities from proceeds of port authority revenue bonds issued for the purpose of constructing industrial-use facilities. Although the statutory exemption involved in *Port Authority* differs from the exemption found in K.S.A. 79-201a *Second,* we find the public purpose of each exemption to be nearly identical—both seek to encourage economic growth by allowing a tax abatement for IRB property. Therefore, our holding in the *Port Authority* case on this issue is precedent for our holding in the case at bar.

In reaching our decision in *Port Authority,* we reiterated that § 1 of the Kansas Bill of Rights is given much the same effect as the Equal Protection Clause of the Fourteenth Amendment. *State ex rel. Tomasic v. Kansas City, Kansas Port Authority*, 230 Kan. at 426. In that decision, we found *Allied Stores of Ohio v. Bowers*, 358 U.S. 522, 3 L.Ed.2d 480, 79 S.Ct. 437 (1959), persuasive, stating:

"The court observed the Equal Protection Clause 'imposes no iron rule of equality, prohibiting the flexibility and variety that are appropriate to reasonable schemes of state taxation.' 358 U.S. at 526. The state taxation scheme must have a rational basis with classifications based on differences having a fair and substantial relation to the object of the legislation. In *Allied Stores of Ohio* the court

found 'a statute which encourages the location within the State of needed and useful industries by exempting them, though not also others, from its taxes is not arbitrary and does not violate the Equal Protection Clause of the Fourteenth Amendment.' 358 U.S. at 528." 230 Kan. at 425.

We next noted that '[w]here constitutional challenges have been made to tax exemption schemes as violative of art. 11, § 1 of the Kansas Constitution, this court has consistently held that the uniform and equal rate of assessment and taxation provision is, in principle and effect, substantially identical to the principle of equality embodied in the Equal Protection Clause of the United States Constitution." 230 Kan. at 426. Since this court had previously determined that the "uniform and equal" provision had not been violated, we also held that the Equal Protection Clause had not been violated. More specifically, the court stated:

"Favorable tax treatment for industrial-use facilities under the Act as amended in 1981 will undoubtedly promote the development of new industries within the state as well as encourage the retention of old and so bears a rational relationship to the otherwise legitimate purpose of the Act." 230 Kan. at 427.

Likewise, we have held in an earlier part of this opinion the exemption does not violate the "uniform and equal rate of assessment and taxation" provision of art. 11, § 1. The exemption is available to any industry which the city or county determines would serve the purposes of the statute and would result in economic benefit to the state.

"The Legislature is presumed to act within its constitutional power despite the fact the application of its laws may result in some inequity. [Citation omitted.] The equal protection clause goes no further than to prohibit invidious discrimination." *Manzanares v. Bell*, 214 Kan. 589, 609, 522 P.2d 1291 (1974). K.S.A. 79-201a *Second* admittedly establishes a system of taxation which favors those industries which receive IRB funding. However, in order to receive such funding, the city or county must find the purposes of the Act would be served by the application of its terms to the particular project. We find the tax exemption for IRB property found in K.S.A. 79-201a *Second* bears a rational relationship to the purpose of promoting economic growth in the state through attraction of new industries and the retention of existing business. Therefore, we find no violation of the Equal Protection Clause of the United States Constitution, and no violation of equal protection under the Kansas Constitution.

## III.

The relator next contends that K.S.A 12-1742 and K.S.A. 79-201a *Second* constitute an unlawful delegation of legislative power without adequate standards and guidelines for the exercise of such power. Art. 2, § 1 of the Kansas Constitution vests legislative power in the legislature: "The legislative power of this state shall be vested in a house of representatives and senate." Any delegation of legislative power must be "authorized by some express provision of the constitution or . . . by reason of clear implication therefrom." *State, ex rel., v. Hines,* 163 Kan. 300, 303, 182 P.2d 865 (1947).

Article 2, § 21 of the Kansas Constitution sanctions delegation of legislative power in limited circumstances. It provides: "The legislature may confer powers of local legislation and administration upon political subdivisions."

The Economic Development Revenue Bond Act was intended to delegate legislative powers to city and county governing bodies to issue IRB's and to lease the property to industries which the governing bodies find will promote the purpose of the Act as stated in K.S.A. 12-1740. Pursuant to K.S.A. 79-201a *Second* and K.S.A. 12-1742, the city or county may then seek tax exemption for the property and may require payments in lieu of taxes.

Cities and counties are political subdivisions of the state upon which the legislature may confer legislative power. *Koppel v. City of Fairway,* 189 Kan. 710, 712, 371 P.2d 113 (1962). The constitution operates to limit the power of legislation conferred to matters of local concern with which the city or county may be expected to deal more effectively than the legislature. *State, ex rel., v. City of Topeka,* 176 Kan. 240, 245-46, 270 P.2d 270 (1954).

We find that the questions of payments in lieu of taxes and the merits of particular projects are matters of uniquely local concern, and are more suited for determination by the local governing bodies of cities and counties issuing the bonds than by the state legislature. We find support for this holding in the Home Rule Amendment, Kan. Const., art. 12, § 5, which empowers cities to determine their "local affairs and government including the *levying of taxes,* excises; fees, charges and *other exactions* . . . ." (Emphasis added.) Clearly, this evidences that the decision of whether to seek tax exemption through issuance

of IRB's and whether to require payments in lieu of taxes are matters of local concern.

The final inquiry in determining the constitutionality of K.S.A. 12-1742 and K.S.A. 79-201a *Second* under art. 2, §§ 1, 21, concerns the adequacy of standards for exercise of the power delegated. While standards must accompany a grant of legislative authority, "great leeway should be allowed the legislature in setting forth guidelines or standards and the use of general rather than minute standards is permissible." *State ex rel., v. Bennett,* 222 Kan. 12, 21, 564 P.2d 1281 (1977).

In *State, ex rel., v. City of Pittsburg,* 188 Kan. 612, this court held that the legislature furnished adequate guidelines for authorization of projects under the Economic Development Revenue Bond Act. In that case we stated: "It is quite true that in delegating powers the legislature must fix adequate general standards, but in many instances the filling in of details must, in the very nature of things, be left to the local authorities." 188 Kan. at 620.

Likewise, in *Rauh v. City of Hutchinson,* 223 Kan. 514, 521, 575 P.2d 517 (1978), this court in discussing the Economic Development Revenue Bond Act stated, "the legislature has enacted the broad general provisions and policy and delegated to the city the administrative function of 'filling in the details' under reasonable and definite standards as contained in the act itself."

One of the "details" to be filled in by the local political subdivision is whether to exact payments in lieu of taxes under K.S.A. 12-1742. This is a proper matter to be negotiated between the issuer of the bonds and the lessees. Since the decision will inevitably depend on the particular city and the particular project involved, it would be impossible for the legislature to draft specific guidelines.

Accordingly, there has been no unconstitutional delegation of legislative authority.

## IV.

The relator next contends that K.S.A. 79-201a *Second,* by permitting tax exemption for projects financed by IRB's, thereby involves political subdivisions and the state in works of internal improvement in violation of Kan. Const., art. 11, § 9. That section provides:

"The state shall never be a party in carrying on any work of internal improvement except that: (1) It may adopt, construct, reconstruct and maintain a state system of highways, but no general property tax shall ever be laid nor general obligation bonds issued by the state for such highways; (2) it may be a party to flood control works and works for the conservation or development of water resources."

It is clear that the constitutional prohibition does not apply to political subdivisions of the state. As this court has stated and relator concedes, art. 11, § 9 only prevents the state *as a state* from engaging in works of internal improvement. *State ex rel. Tomasic v. Kansas City, Kansas Port Authority*, 230 Kan. at 421. In the *Port Authority* case, we held that even though K.S.A. 12-3402(a), prior to its 1981 amendment, referred to the Port Authority as an "agency of the state," the state was not engaging in acts of internal improvement.

However, the relator argues that although the issuance of IRB's does not involve the state in works of internal improvement, the granting of a tax abatement on that property does. The relator argues that this tax abatement puts the City in direct competition with other "landlords" who cannot offer tax abatements to their industrial lessees. Relator refers to two cases, *State, ex rel., v. Kaw Valley Drainage District*, 126 Kan. 43, 267 Pac. 31 (1928); and *State, ex rel., v. City of Hiawatha*, 127 Kan. 183, 272 Pac. 113 (1928), which apply the art. 11, § 9 prohibition to cities in two situations: when the government subdivision is "involved" in a commercial enterprise to the detriment of private businesses; and when the involvement will threaten the financial stability of the political subdivision.

We find that these cases are not on point. Both involved a political subdivision which was operating a purely commercial enterprise without legislative authority to do so. In the case at bar, it is the lessee, not the City, which will be operating the industry. Moreover, we do not see merit in the argument that the City's status as a landlord involves it in a "purely commercial enterprise." The legislature, in K.S.A. 12-1740 *et seq.*, clearly authorized the City to lease IRB property. Since the legislative intent was to allow, and not prohibit, this activity, art. 11, § 9 is not violated even under the reasoning of the cases cited by relator. See *State, ex rel., v. Kansas City*, 151 Kan. 2, 98 P.2d 101 (1940).

In the *Port Authority* case we stated:

"Internal improvements are not prohibited per se. The state may authorize public or private corporations or individuals to construct internal improvements." 230 Kan. at 421.

By enacting K.S.A. 79-201a *Second,* the state has authorized cities and counties to request tax abatements for IRB property subject to approval by the State Board of Tax Appeals. Assuming *arguendo* that the activity of a city in issuing IRB's and requesting tax abatements constitutes works of internal improvement, the state itself is not involved in the works of internal improvement. Therefore, art. 11, § 9 of the Kansas Constitution is not violated.

Having considered all constitutional attacks made on K.S.A. 79-201a *Second* and K.S.A. 12-1741, and having determined them to be without merit, we reaffirm the observations made by this court in the *Port Authority* case:

"[T]he legislature, in emphasizing economic development as a means of promoting the general welfare of the state, has given that economic development priority as a matter of public policy . . . . To further economic development of the state, the legislature has attempted to provide the most favorable, constitutionally permissible, conditions to attract industry to the state and to retain industrial facilities currently operating in the state. This court is cognizant of the public interest in such economic development." 230 Kan. 427-28.

## V.

The next issue raised is whether K.S.A. 79-201a *Second* is applicable to the GM project to the extent it is financed with IRB's paid for under a lease-purchase agreement. Relator advances three arguments in support of his contention that 79-201a *Second* does not apply.

It is first contended the lease-purchase agreement, which gives GM an option to purchase for a nominal sum, makes the agreement an executory contract for sale rather than a lease and, therefore, disqualifies the project from exemption as it is not "owned" by the City, within the meaning of K.S.A. 79-201a *Second.*

K.S.A. 79-201a provides in pertinent part:

"The following described property, to the extent herein specified, shall be exempt from all property or ad valorem taxes levied under the laws of the state of Kansas:

. . . . .

"*Second.* All property used exclusively by . . . any municipality . . . . All property *owned* or *operated* by . . . any municipal-

ity . . . which is used or is to be used for any governmental or *proprietary* function and for which bonds may be issued or taxes levied to finance the same, shall be considered to be 'used exclusively' by the . . . municipality . . . for the purposes of this act. . . . Any property constructed or purchased wholly with the proceeds of revenue bonds issued on or after July 1, 1981, under the authority of K.S.A. 12-1740 to 12-1749, inclusive, and amendments thereto, shall be exempt from taxation only for a period of 10 calendar years after the calendar year in which the bonds were issued. Any property constructed or purchased in part with the proceeds of revenue bonds issued on or after July 1, 1981, under the authority of K.S.A. 12-1740 to 12-1749, inclusive, and amendments thereto, shall be exempt from taxation to the extent of the value of that portion of the property financed by the revenue bonds and only for a period of 10 calendar years after the calendar year in which the bonds were issued." (Emphasis added.)

K.S.A. 12-1741 permits the City to enter a lease *or* lease-purchase agreement with "any person, firm or corporation" for the facilities financed by IRB's. In accordance with this provision, the City of Kansas City proposes to enter a lease-purchase agreement with GM.

The agreement vests legal title in the City subject to the lease and indenture. *Only* after the bonds are redeemed can General Motors exercise its option to purchase and have title conveyed. Any default on the part of GM gives the City discretion to elect among remedies, including acceleration of bond payments, written notice to terminate the lease subject to 30-day cure, and reentry without termination of the lease. Under the latter two remedies, the property reverts to the City. Clearly, General Motors' possession and eventual purchase of the property depends on fulfillment of the terms of the agreement.

This court recently reviewed the status of a substantially similar lease-purchase agreement in *Misco Industries, Inc. v. Board of Sedgwick County Comm'rs*, 235 Kan. 958, 685 P.2d 866 (1984). In that case, the issue was whether the agreement between Misco and the City of Wichita pursuant to the issuance of IRB's was a true lease and, therefore, not subject to the mortgage registration fee, or whether it was an executory contract for sale, thereby creating a mortgage subject to the mortgage registration fee.

In determining that the agreement was, in fact, a true lease, this court stated:

"To determine whether an instrument is a lease, or creates a relation other than that of lessor and lessee, the intention of the parties, as ascertained from the

instrument itself, will govern. The fundamental rule in the construction of the agreement is to ascertain the intent of the parties, and in such construction the courts look to the language employed, the subject matter and the surrounding circumstances. [Citation omitted.]

. . . .

"Where the owner of land leases it for a period of years at a stipulated rental, and the contract of lease contains a stipulation that the lessee shall have the right, during or at the expiration of the lease, to purchase the premises, if the lessee so elects, at a fixed price, there is no complete sale. The lessee does not acquire an estate in the land beyond the leasehold interest until he has elected to accept the offer and has paid or tendered the purchase price set out in the contract." 235 Kan. at 964-66.

Under the lease agreement proposed in the instant case, GM is only a lessee with an option to purchase at a fixed sum. If GM chooses not to exercise the option, the City retains full ownership rights in the property to reenter and take possession. According to Kansas law, as stated in *Misco,* the City under this lease-purchase agreement is the owner of the leasehold property. See also *Brown v. Thomas, Sheriff,* 37 Kan. 282, 15 Pac. 211 (1887); and *Kansas Power Co. v. Smith County Comm'rs,* 122 Kan. 252, 251 Pac. 1114 (1927). Thus, this property qualifies for the statutory tax exemption found in K.S.A. 79-201a *Second.*

The cases cited by the relator are inapplicable to the case at bar as they were decided under the Uniform Commercial Code, the Uniform Consumer Credit Code, and the Internal Revenue Code. See, *e.g., Percival Const. Co. v. Miller & Miller Auctioneers,* 532 F.2d 166 (10th Cir. 1976); *Oesterreich v. Commissioner of Internal Revenue,* 226 F.2d 798 (9th Cir. 1955).

Also, the relator relies extensively on *State ex rel., Cartwright v. Dunbar,* 618 P.2d 900 (Okla. 1980), a case which found a purported lease agreement in a similar situation to the case at bar to be an executory contract for sale under Oklahoma law. In the *Port Authority* case we determined that the Oklahoma case was inapplicable in determining the validity of tax exemptions under Kansas law. 230 Kan. at 438. We adhere to that determination.

The relator next argues that GM's "interest" in the proposed project will not be exempt under K.S.A. 79-201a *Second* and that only the City's "interest" in the project will qualify for the exemption. The argument is that the lease interest held by GM is "personal property" within the meaning of K.S.A. 79-102 and since K.S.A. 79-201a *Second* only exempts property owned or operated by cities, GM's interest in the property will not be exempt. Relator cites no authority to support this interpretation.

We find this argument to be wholly without merit. It is not supported by Kansas law or any compelling policy considerations. In fact, taxation of divided interests in real property is not within the scheme of the Kansas taxation statutes. See Zinn, *The Real Estate Lease in Kansas: Some Problems of Characterization,* 17 Kan. L. Rev. 707, 725 (1969). Accordingly, this court does not hold the leasehold interest of a lessee should be separately assessed and taxed.

Finally, relator argues that to the extent GM may purchase bonds issued by the City for its project, the project will not be "financed by bonds" as required by K.S.A. 79-201a *Second.* He further argues that the obligations issued by the City will not be "bonds" within the meaning of K.S.A. 79-201a *Second.*

Again, relator cites no authority in support of this argument, and we find it to be wholly without merit.

The Inducement Agreement between the City and GM states that GM may purchase some or all of the bonds, but this agreement is not binding on either party. Even if GM does purchase the majority of the bonds, the status of the "bonds as bonds" will not be affected. The City will be the issuer of the bonds, the proceeds will finance the facility, and the source for repayment of the bonds will be limited to revenues derived from the facility. The lessee and bondholders may change, through assignment, during the ten-year period, but the issuer—the City of Kansas City—will remain the same. Therefore, we find that the bond issuance will be "real" and legitimate no matter who purchases the bonds.

## VI.

The next issue raised is whether the purpose of K.S.A. 12-1740 *et seq.,* will be served by issuing bonds to finance the GM plant. Heretofore in this opinion we found that the purpose as stated in K.S.A. 12-1740 was intended to apply to K.S.A. 79-201a *Second,* and that such purpose was for the "public benefit" and thus the statutory tax exemption did not violate art. 11, § 1 of the Kansas Constitution.

It cannot be seriously contended that the GM project would not serve the purposes set forth in K.S.A. 12-1740. The construction and operation of the GM plant in the Fairfax district will not only locate new industry in the state but will insure retention of

jobs in the state which very probably would be lost when the present GM plant closes due to obsolescence. The substantial, peculiar and direct benefits from GM's presence in Kansas City, Kansas, in the past, and the anticipated benefits flowing from its continued presence, have been stated in the Resolution of the City authorizing the Inducement Agreement as follows:

"WHEREAS, the Council has found that the expected closing of the present General Motors plant located in Kansas City, Kansas, will have a devastating negative economic impact on the public welfare of the City, in that the taxing entities of Wyandotte County will lose tax revenues, the citizens of the City will lose jobs, the incidence of unemployment in the community will increase with attendant economic and social costs, the City's Board of Public Utilities will lose one of its biggest customers, the City will lose revenues from franchise and sales taxes based upon utility billings, the City will lose the significant beneficial secondary economic impact it now enjoys because of the presence of the General Motors plant; and

"WHEREAS, the Council has found that the City has seen an outmigration of population and industry over the past years, that the City suffers from a high level of unemployment compared to the rest of the state, that such high unemployment constitutes an economic and social liability, that in recent years the City has had serious problems of a deteriorating housing stock and infrastructure and that the City's declining tax base prohibits it from addressing these problems; and

"WHEREAS, the Council has found that the construction of the Project will significantly assist in the City's revitalization, promote economic stability and prosperity, provide greater employment opportunities, both in the construction and the operation of the Project, alleviate economic depression, outmigration of population, and declining employment opportunities, and has the potential for attracting and stimulating other investment in the community; and

"WHEREAS, the Council has found that the Project is a more productive use of the Property than its present use, that the closure of the Fairfax Airport will result in a financial savings to the Port Authority, and that the City as a result of the airport closure will be able to reallocate $3,450,000 in planned airport improvements."

## Specifically, the City found:

"(5) The Project will promote the development of interstate and intrastate traffic in the City of Kansas City, Kansas, and the State of Kansas.

"(6) The construction of the Project will create new jobs in the City.

"(7) The Project will increase the tax base after the initial period of tax abatement for all the taxing entities of Wyandotte County.

"(8) The Project will retain in the City existing jobs which would otherwise be lost when the existing General Motors plant closes.

"(9) The Project will have a significant beneficial secondary impact on the City's economy.

"(10) The Project will provide jobs for the City's unemployed.

"(11) The Project will reverse the trend of limited commercial and industrial investment in the City."

The project clearly serves the purposes specified in 12-1740. The relator argues that while the project may serve the purposes of the statute, the only perceived benefit to GM is the abatement from taxes under K.S.A. 79-201a *Second* (GM may purchase all of the bonds and, therefore, relator argues, does not need the "financing") and this is insufficient to justify proceeding under the Economic Development Revenue Bond Act.

We disagree with this contention. The "purpose" of the Economic Development Revenue Bond Act is to encourage industrial development in the State of Kansas. To bring this about, the legislature has allowed cities to offer certain inducements—revenue bond financing and ten-year tax exemptions for property so financed. It is of no concern to the City—or this court—which particular "inducement" attracts the industry.

The City of Kansas City has determined that the purposes of the statute have been met and that the City will, in fact, profit by GM's presence over the ten years the exemption applies. These determinations were properly made by the parties involved.

## VII.

Relator next contends that since it is conceivable the payment in lieu of tax agreement may result in years during the ten-year tax abatement period in which no payments in lieu of taxes are due, the City lacks authority to enter such an agreement. The gist of the argument is that the provisions of K.S.A. 12-1742 are mandatory rather than permissive, so the City would be violating the statute by failing to require payments in lieu of taxes for each of the ten years of exemption. In support of the position that the statute must be read as *requiring* payments in lieu of taxes, the relator cites art. 11, § 1 of the Kansas Constitution, which states:

"[T]he legislature may provide for the classification and the taxation uniformly as to class . . . or may exempt any of such classes of property from property taxation and impose taxes upon another basis in lieu thereof."

This constitutional provision does not support the relator's argument. The tax exemption involved herein is based on a *statutory* exemption and *not* a constitutional exemption. Therefore, the constitutional requirement of imposing taxes upon another basis for constitutionally tax-exempt property is not applicable.

K.S.A. 12-1742 provides as follows:

"Such agreements *shall provide* for a rental sufficient to repay the principal of and the interest on the revenue bonds. Such agreements *may also provide* that the lessee shall reimburse the city or county for its actual costs of administering and supervising the issue. All fees paid in excess of such actual costs and any other obligation assumed under the contract shall be deemed payments in lieu of taxes and distributed as provided herein. *If the agreement provides for a payment in lieu of taxes to the city* or county, such payment shall immediately upon receipt of same be transmitted by the city or county to the county treasurer of the county in which the city is located. Payments in lieu of taxes received pursuant to agreements entered into after the effective date of this act *shall include all fees or charges paid for services normally and customarily paid from the proceeds of general property tax levies,* except for extraordinary services provided for the facility or an extraordinary level of services required by a facility. Payments in lieu of taxes *may be required* only upon property for which an exemption from ad valorem property taxes has been granted by the state board of tax appeals. . . . *Any payment in lieu of taxes* shall be divided by the county treasurer among such taxing subdivisions in the same proportion that the amount of the total mill levy of each individual taxing subdivision bears to the aggregate of such levies of all the taxing subdivisions among which the division is to be made."

K.S.A. 1984 Supp. 12-1744a(a)(7) requires the city to provide an informational statement to the Board of Tax Appeals including "the amount of *any payment* to be made in lieu of taxes." (Emphasis added.)

The legislature, in these statutes, has clearly used permissive language. The legislature knows how to use mandatory language (for instance, payment of rentals is mandatory by the use of the word "shall") and would have done so had they meant for payments in lieu of taxes to be mandatory.

Relator argues that the language in K.S.A. 12-1742 which says payments in lieu of taxes *shall* include all fees or charges for services normally and customarily paid from the proceeds of general property tax levies evidences an intent by the legislature to require cities to impose payments in lieu of taxes for otherwise exempt property.

We cannot agree with this interpretation. The statute must be read *in pari materia.* Since the statute clearly evidences an intent that the imposition of payments in lieu of taxes be permissive, there is no support for the relator's argument. We believe the "shall" language used by the legislature was meant to insure cities would not avoid the requirement that monies received be distributed to all political subdivisions on a pro rata basis by charging a fee for a normal tax sponsored service and calling it an "actual cost."

Relator further argues that the payment in lieu of tax agreement in this case is invalid because it results in the entire project enjoying tax-exempt status for more than ten years, contrary to K.S.A. 79-201a *Second*. The agreement provides that each "portion" of the total project financed by separate bond issuances will enjoy tax abatement for a period of ten years. The construction period for the entire project will exceed one year. The result is that while the entire project will carry exemptions for more than ten years, each series of bonds will finance only a portion of the project and each such portion will receive only a ten-year exemption in accordance with the statute. Therefore, there is no violation of K.S.A. 79-201a *Second*.

## VIII.

The final challenge made by the relator is that the City lacks the authority to convey the project site to GM for less than the appraised value. The stipulation asserts that GM will pay $250,000 for the cost of acquiring the project site and that no appraisal has been made of this site. The relator contends that since the site consists of 568 acres in the heart of the city's industrial district, its real value must far exceed the proposed payment. The relator argues this transfer is in effect a "contribution" or "donation" which the City lacks the authority to make.

We find that the City will receive adequate consideration for the property it will transfer to GM. Not only will the City receive the cash payment of $250,000, it will receive the real and valuable consideration of the economic benefits which are expected to flow from GM's presence in the City.

This court has previously held that the entire transaction is to be taken as a whole and that the consideration for a transfer of property by the state to a private entity may consist, at least in part, of the public benefit which flows from the transfer. See *Ullrich v. Board of Thomas County Comm'rs*, 234 Kan. 782, 676 P.2d 127 (1984).

Relator also asserts that the Joint Port Authority lacks the authority to convey its interest in the project site to the City for a nominal sum as provided in the stipulation. The stipulation also states that the Port Authority originally acquired the real estate from the City for a nominal sum.

K.S.A. 12-3402(c) authorizes the city which created a port authority to dissolve the same and provides that the properties of the port authority will be transferred to the city. Since the city has the authority to dissolve a port authority, it follows that it also has the authority to reacquire port authority property, for a nominal sum, which it had originally transferred to the port authority for a nominal sum. Accordingly, relator's argument is without merit.

The court finds K.S.A. 79-201a *Second* does not violate the Kansas Constitution or the United States Constitution in any of the particulars charged by the relator, and the challenged actions taken or proposed to be taken by the respondents are legal.

In accordance with the foregoing opinion and findings of this court, judgment is entered for the respondents.

HERD, J., dissenting: The ten-year exemption from taxation provided under K.S.A. 79-201a *Second* for property financed by industrial revenue bonds fails to qualify as either a constitutional or statutory exemption.

To qualify as a constitutional exemption under Article 11, § 1 of the Kansas Constitution and the implementing provisions of K.S.A. 79-201a *Second*, municipally owned property must be exclusively used by the municipality. It is too obvious to require argument that the property involved in this case will be used exclusively by General Motors Corporation to build automobiles as a profit-making endeavor by the corporation rather than used exclusively by the municipality. We have defined exclusive use many times. In *Seventh Day Adventist v. Board of County Commissioners*, 211 Kan. 683, Syl. ¶ 2, 508 P.2d 911 (1973), we stated:

"The phrase 'used exclusively' in the constitution and statute means that the use made of the property sought to be exempted from taxation, must be only, solely and purely for the purposes stated, and without participation in any other use."

See also *Lutheran Home, Inc. v. Board of County Commissioners*, 211 Kan. 270, 505 P.2d 1118 (1973); *Topeka Presbyterian Manor v. Board of County Commissioners*, 195 Kan. 90, 402 P.2d 802 (1965); *Kansas State Teachers Ass'n v. Cushman*, 186 Kan. 489, 351 P.2d 19 (1960).

In *City of Arkansas City v. Board of County Commissioners*, 197 Kan. 728, 420 P.2d 1016 (1966), we held where city owned

property was leased for production of oil and gas and production was obtained, the property ceased to be used exclusively by the city and the tax exemption was lost. That case is analogous to the situation here. Kansas City has agreed to lease $775 million worth of property to General Motors for ten years, giving GM an option to purchase the property from the City for $100. The annual rental for the lease is the amount required for debt service on the industrial revenue bonds plus a payment to the City in lieu of taxes. Only part of the payment in lieu of taxes accrues to the City. The tax exemption here clearly does not qualify as a constitutional exemption.

In spite of the requirements of Article 11, § 1 of the Kansas Constitution requiring the legislature to provide a uniform and equal rate of assessment and taxation except for certain enumerated exempt classes of property, we have recognized the right of the legislature to provide other tax exemptions under certain conditions. To meet the constitutional test, a statutory exemption must pass a four-pronged test as stated in the majority opinion: (1) It must promote the public welfare; (2) it must provide a substantial, peculiar benefit; (3) it must not provide for a large accumulation of tax-exempt property; and (4) it must not be a preferential classification of property. See *State, ex rel., v. Board of Regents,* 167 Kan. 587, 207 P.2d 373 (1949); *Alpha Tau Omega v. Douglas County Comm'rs.,* 136 Kan. 675, 18 P.2d 573 (1933); and *Washburn College v. Comm'rs of Shawnee Co.,* 8 Kan. 344 (1871).

The majority opinion indicates the legislature is the sole judge to determine if it has met the four-pronged test for constitutionality of statutory tax exemption. I disagree. Chief Justice Marshall in *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), states the reason:

"Certainly, all those who have framed written constitutions contemplate them as forming the fundamental and paramount law of the nation, and consequently, the theory of every such government must be, that an act of the legislature, repugnant to the constitution, is void.

. . . .

"It is, emphatically, the province and duty of the judicial department, to say what the law is. Those who apply the rule to particular cases, must of necessity expound and interpret that rule." p. 176

Thus, determination of the constitutionality of the legislature's action is a judicial, rather than legislative, function.

Let us now turn to an examination of the constitutionality of the legislation. The Industrial Revenue Bond Tax Exemption Act passes only two prongs of the four-pronged test. It promotes the public welfare and provides a substantial benefit by encouraging industrial development and thus provides employment for the residents of the community utilizing the exemption. However, as stated by the majority, over $4 billion worth of property has been exempted from taxation in Kansas under the exemption. That is a large accumulation of exempt property by any standard and with the exemption here proposed it will exceed $5 billion worth of exempt property. This exemption clearly provides for a large accumulation of tax-exempt property in violation of test No. 3. The fact the property will be placed on the tax rolls ten years hence does not change the issue. The fact remains that for ten years $5 billion worth of property will not bear its share of the cost of government.

Finally, the industrial revenue bond exemption creates a preferential class. Businesses which can convince a city or county government to fund them with industrial revenue bonds are the preferred class. It is usually a foreign company which is being enticed to change locations with the indirect subsidy of tax exemption. Local established business, many times in competition with tax-exempt companies, seldom qualify for the tax benefit as they are not new industrial development. Usually the benefit conferred, namely, increased employment, falls short of paying its way in taxes. The municipality must furnish the increased municipal services, among which are electricity, water, sewer, streets, and police and fire protection, from an unexpanded tax base. Most of the increases in taxes received from new residents are income taxes and sales taxes, a large part of which are paid to the state, which bears none of the costs of increased services. Thus, the tax exemption also fails test No. 4. We have repeatedly held exemption provisions must be strictly construed and that taxation is the rule and exemption the exception, with the burden on those who claim exemption. *State, ex rel., v. Security Benefit Ass'n,* 149 Kan. 384, 87 P.2d 560 (1939). Thus, that part of K.S.A. 79-201a *Second* pertaining to IRB property is unconstitutional.

I also take issue with the majority's statement in Syllabus ¶ 13 and the corresponding statement in the opinion that article 11,

§ 1 of the Kansas Constitution is substantially identical with the Equal Protection Clause of the 14th Amendment to the United States Constitution. The sections of the two constitutions are not analogous. Article 11, § 1 provides for a uniform and equal method of assessment and taxation for all property. Under the Kansas Constitution, there is only one class of property,

"except that the legislature may provide for the classification and taxation uniformly as to class of motor vehicles, mineral products, money, mortgage, notes and other evidence of debt or may exempt any of such classes of property from property taxation and impose taxes upon another basis in lieu thereof."

On the other hand, the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution permits a taxation scheme on a rational basis with classification of property based on differences having a fair and substantial relationship to the legislative objective. Thus, we see the Equal Protection Clause permits classification while the uniform and equal clause does not. If we adopt the majority's holding in this regard there is no reason to submit the classification amendment, adopted this year by the legislature, to the people since we would have accomplished classification by court decree.

I would hold the portion of K.S.A. 79-201a *Second* granting tax exemption to industrial revenue bond property unconstitutional in violation of the uniform and equal clause of article 11, § 1 of the Kansas Constitution. I would reverse *State ex rel. Tomasic v. Kansas City, Kansas Port Authority,* 230 Kan. 404, 636 P.2d 760 (1981), and make this judgment effective prospectively. If industrial revenue bond property is to be exempt from taxation in Kansas, the constitution should be amended to permit it. The public deserves an opportunity to vote on the issue. This decision and that in the *Port Authority* case were decided as acts of expediency. The rule of expediency is bad policy, violative of the very essence of constitutional government. This court should fulfill its role as guardian of the constitution on this issue as it so zealously does on other issues.

LOCKETT, J., concurring: I agree with Justice Herd that it is the duty of the Supreme Court to say what the law is. We cannot delegate the responsibility or the authority to determine if a certain statute creating a tax exemption has met the four-pronged test for constitutionality. It is within the power of the courts, not

the legislature, to set the standard for judicial determination of the constitutionality of a statute. For a legislature to have and exercise such power negates the constitutional power of judicial review.

Justice Herd correctly states that the Kansas Constitution provides for a uniform and equal method of assessment and taxation of all property, a vast difference from that allowed under the United States Constitution. The Equal Protection Clause of the U.S. Constitution permits classification while the uniform and equal clause of the Kansas Constitution does not!

Unfortunately, through the widespread use of principles of construction by this court and the legislature's attempts to circumvent the restrictions of the "uniform and equal clause," the clear intent of the constitution has been made ambiguous. Legislative enactments and decisional leapfrogging by this court have reached a point where the words of the constitution have been ignored and rendered meaningless.

The legislative acts and court decisions have formulated new exceptions to the "uniform and equal clause." Every statement by the legislature and the court has become the basis for a wholly new situation designed to be more adaptable to changing times and requirements of a modern society facing new challenges. Intentional destruction of the restrictions contained in our constitution has occurred. Fortunately, there has been no erosion by the legislature of the rights guaranteed to the people of this state by the United States Constitution or this court.

This is not the time to abandon the course that has been set and return to the restrictions of our written constitution. The legislature must first be made aware that the court can no longer follow the rule of expediency and continue to be a co-partner in ignoring the clear statement of our constitution. Should the legislature fail to act within a reasonable time after receiving this warning, then the court must act and no longer ignore our constitution's restrictions.